## COMMONWEALTH *vs.* ROY SMITH.

Middlesex.    February 7, 1966. — April 15, 1966.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, SPIEGEL,
& REARDON, JJ.

*Jury and Jurors. Homicide. Evidence,* Photograph, Speculation, Of ap-
pearance, Judicial discretion, Of consciousness of guilt, Relevancy and
materiality. *Practice, Criminal,* Charge to jury, Requests, rulings and
instructions, Judicial discretion, New trial.

No error was shown in a murder case in the denial at the opening of the
trial of a motion by the defendant to examine reports by police as to
interviews of prospective jurors or members of their families where
examination of the prospective jurors at the trial revealed the scope and
substance of the police inquiries and was adequate to show that the
inquiries had not resulted in prejudice to the defendant.    [601–602]
Circumstantial evidence warranted conviction of a defendant of murder-
ing a woman found strangled one afternoon in her home after the de-
fendant had been there earlier in the day to perform domestic work and
had left.    [604, 606–607]
No error or abuse of discretion appeared in numerous challenged rulings
on evidence at a trial for murder of a woman found strangled in her
home after the defendant had been there to perform domestic work, in-
cluding the admission of colored photographs of the woman after black
and white photographs of her had been admitted, exclusion of evidence
involving speculation, exclusion of questions as to whether the defendant
appeared "normal" or "relaxed," admission of statements by the de-
fendant shortly after the murder tending to show consciousness of guilt,
and refusal to strike testimony as to the amount of money in the de-
fendant's possession on the evening of the murder.    [607–609]
The judge at a criminal trial cannot be required to charge the jury as to
isolated bits of evidence.    [610–611]
There was no error at a criminal trial in failing to give in terms requested
instructions to the jury as to matters adequately covered in the charge.
[611]
There was no abuse of discretion in a murder case in denial of a motion
for a new trial grounded on the circumstances that, after the arguments
to the jury one afternoon, the judge informed the jury of the assassina-
tion of the President of the United States, which had just occurred, and
of his, the judge's, decision to continue with the case, and, after caution-
ing the jury not to let the assassination affect their decision, adjourned
court until the next morning, when the charge to the jury was given and
the jury took the case, and that during the overnight recess the jury
might have seen on television some of the events in connection with the
assassination.    [611–613]

INDICTMENT found and returned on March 21, 1963.

The case was tried in the Superior Court before *Bolster, J.*

*Beryl W. Cohen* for the defendant.

*Richard S. Kelley,* Assistant District Attorney (*Ruth I. Abrams,* Assistant District Attorney, with him), for the Commonwealth.

WHITTEMORE, J.   On November 23, 1963, in the Middlesex Superior Court, a jury found the defendant guilty of murder in the first degree, of Bessie Goldberg, of Belmont, with a recommendation that sentence of death not be imposed.[1]   The trial was subject to G. L. c. 278, §§ 33A to 33G, as amended.   The defendant on this appeal has argued only the assignments of error discussed below.

1.   No error is shown in the denial on Tuesday, November 5, 1963, the day trial began, of the motion that the Commonwealth be ordered to give counsel for the defendant an opportunity "to examine before trial all investigative reports in connection with jurors who have been returned for service."

The defendant's counsel stated, and the later examination of the prospective jurors confirmed, that, at the request of the district attorney's office, police officers sometime before the trial had interviewed prospective jurors, or a member of the juror's family, to obtain answers to the questions or some of the questions on a prepared form. The judge denied the motion, but ruled that he would ask each juror if he had been interviewed by police officers or others, and, if so, whether that had made it impossible for him to return a fair, unbiased and impartial verdict.   The judge asked appropriate questions in accordance with his ruling and, in addition, ascertained from each juror interviewed that there had been nothing said to him about the nature of the case that was to be tried.[2]

---

[1] The defendant was also found guilty of larceny and not guilty of rape.

[2] One prospective juror recalled that it had been described as a "special murder trial."

The defendant argues that the interviews must be assumed to have intimidated the jurors, or at least to have destroyed their impartiality. We assume the contention is that the motion to examine the reports should have been allowed to permit the defendant to discover the scope of the inquiry and whether the questions were such as to tend to prejudice the jury.

The defendant fails to show that he was prejudiced in this respect, for in the course of the examination the scope and substance of the inquiry was made plain. There was no extended examination of any prospective juror as to the questions on the form, or asked by the officers, but such questions as were asked of the jurors on the voir dire, and answered, with the information volunteered by one or another of the jurors, disclosed to judge and counsel the nature of the inquiries.[3]

There was no motion at any time to dismiss the panel; indeed, among the twelve jurors accepted by the defendant before his peremptory challenges had been exhausted, were six who had been interviewed and three who knew of interviews by officers with members of their families. Further, the defendant did not challenge for cause the one of the two jurors thereafter chosen, who testified to a police inquiry, in that instance of the juror's wife.

We think the judge's inquiries were adequate to assure that the police investigation had not prejudiced the panel. *Commonwealth* v. *DiStasio*, 294 Mass. 273, 281. *Commonwealth* v. *Millen*, 289 Mass. 441, 475–476. *Commonwealth* v. *Geagan*, 339 Mass. 487, 503–504.

Although, as noted, the exception does not present the issue, we think that the questions by the police officers were not of such a nature as to require a ruling that, notwithstanding the testimony to the contrary, prejudice must be presumed. *Commonwealth* v. *Cero*, 264 Mass. 264, 275–

---

[3] According to answers of prospective jurors, the questions were in respect of the juror's age, place of birth, state of health, occupation and place of his employment (or as to a female juror, of her husband), length of time in present job, organizational memberships, court record, and views on certain issues, that is, whether opposed to upholding the law, to police officers, or to capital punishment.

276. *Commonwealth* v. *DiStasio,* 294 Mass. 273, 281–282. Compare *Sinclair* v. *United States,* 279 U. S. 749 (shadowing of jurors during trial); *Gideon* v. *United States,* 52 F. 2d 427, 428–429 (8th Cir.). (In an indictment under the National Prohibition Act the questions included, "Are you in favor of Prohibition?")

The defendant does not argue that the disallowance of the motion deprived him of a fair trial in that the district attorney had an advantage in the challenging of the jurors. Whether there was any advantage as to any juror is speculative. Having in mind the uncertainties inevitably involved in attempting to forecast how a particular person will regard evidence, or parties, or the other varied aspects of a contested case, we think that the exception would not be sustainable on this ground. The judge could weigh this factor along with others, including the time when the motion was made,[4] but the outcome lay with him.

We believe, nevertheless, that the practice of using police officers to gather appropriate information about prospective jurors should be subject to the general supervision of the trial court and that the information obtained should be as available to the defendant as to the district attorney. See *Commonwealth* v. *Balliro,* 349 Mass. 505, 515–518. In several cases where error has been claimed in respect of such inquiries, the equal availability of the information appeared. *Commonwealth* v. *Millen,* 289 Mass. 441, 475–476. *Commonwealth* v. *DiStasio,* 294 Mass. 273, 281. *Commonwealth* v. *Dougherty,* 343 Mass. 299, 306. In *Commonwealth* v. *Cero,* 264 Mass. 264, 274, the court noted that there was no proof that the results of the investigation were not open to the defendant's inspection. The public interest in assuring the defendant a fair trial is, we think,

---

[4] The judge referred to a conference with counsel on the preceding day in which he had received a negative reply to his question whether there were other motions. At the hearing on the motion, the assistant district attorney stated that the reports then in his possession bore his notes as to his "personal attitude on some of the jurors." It does not clearly appear when the defendant's counsel learned of the police interrogations. The jury lists were made available to counsel on the preceding Friday.

equal to the public interest in assuring such a trial to the Commonwealth.  The police, as agents of the public, should not, for such an investigatory purpose, be available for only one side in the pending contest.  The subject could appropriately be dealt with in a rule of Court.

2.  There was no error in the denial of the motion for a directed verdict.  The evidence was circumstantial.  The jury could have found as follows:  On the morning of March 11, 1963, the defendant walked from his apartment at 175 Northampton Street, Boston, to the district office of the Division of Employment Security on Huntington Avenue.  Between 11:45 A.M. and 12 noon he left that office with an identification card introducing him to Mrs. Goldberg at 14 Scott Road, Belmont, and a slip directing him to that address.  The interviewer at the employment office, thinking that she detected liquor on the defendant's breath, had asked if he had been drinking.  He had "leaned a little backwards . . . [and] said no" and the interviewer, then thinking he had not been drinking, had sent him out.  The defendant arrived at the Goldberg house about 12:45 or 1 P.M.  He later told the police that he arrived before noon and left at exactly 3:45 P.M.  The jury could have found, however, from the testimony of several other witnesses, that he left the house at about 3:05 P.M.  Israel Goldberg, the murdered woman's husband, telephoning from his place of business in Chelsea, spoke with his wife at about 2:20 P.M.  Goldberg arrived home at about 3:50 P.M., found his wife's body in the living room and telephoned the police.  They arrived in a few minutes and found Goldberg excited, nervous and hysterical.  Mrs. Goldberg had been strangled with one of her stockings; the disarray of her garments and the bodily exposure (with the later report of a microscopic examination and related testimony of Goldberg) tended to show rape.  The living room was in disorder, most of the furniture was in the middle of the room, the divan was pushed to one corner, living room ornaments were on the dining room table, and the vacuum cleaner, with attachments, was in the center of the living room.

Palm or fingerprints, later identified as the defendant's, were, in due course, found on the mantel in the living room, on the mirror hanging above it, and on the vacuum cleaner. After his arrest, the defendant told the police that he cleaned several rooms, got all through with his work and left the rooms in order; also that he did not clean the mirror, that he "didn't have anything to do" with it and he did not recall seeing a mantel.

Children coming home from school about 3 P.M. and soon thereafter playing ball in the street saw the defendant on the street near the Goldberg house and saw Goldberg come home; they did not observe anyone else in the street near the house in the interval. Their opportunity for observation extended over a good part though not all of the time between the defendant's departure and Goldberg's return. A practical nurse employed in the house next to the Goldberg residence was watching the children in the street from about 3:25 P.M. until about 3:45 P.M. She saw no one around the Goldberg house other than the children. She saw Goldberg come home.

The defendant spent the night of March 11–12 in the apartment of Mrs. Dorothy Hunt, in Cambridge, drinking with friends. When he arrived Mrs. Hunt observed that "he had had something to drink." She was then cooking supper; she has supper "between five and six." The defendant had most recently been with Mrs. Hunt in late October, 1962. On March 11 he brought liquor and beer with him and went out twice in the evening to buy more liquor. Later, at a time placed by one witness as between 12 midnight and 1 A.M., William Cartwright, one of the companions of the evening, drove the defendant, another man, and Mrs. Hunt to Boston in Cartwright's car intending to go to the defendant's house at 175 Northampton Street. They did not stop at the house. In Northampton Street the defendant directed Cartwright to "slow down" and then to "go faster, they are still here." Cartwright saw two men standing in front of the building that the defendant pointed out. Police officers were watching that building from

11:30 P.M. on March 11, or midnight, to 5 or 5:30 A.M. on March 12. The defendant was with Mrs. Hunt on March 12, 1963, until arrested in the afternoon, going out with her and her daughter to an optometrist's and to a coffee shop in the morning.

The defendant told the police that he had $2 with him when he went to Belmont on March 11 and that he was paid $6.30 for his work at the Goldberg house. He had $3.20 with him when arrested. Goldberg had left bills (one in the amount of $10, five in the amount of $1) on the night table in the bedroom before leaving home in the morning, after having a conversation with his wife. This was for her use in paying the expected cleaning man. He had given his wife $7 on March 10 for some purchases; she had not spent it all. In the afternoon of March 11 her pocket-book was found open on top of a bureau with the wallet missing. The money was gone from the night table. The defendant on the evening of March 11 was seen with a ten, a five and some one dollar bills when he purchased whiskey. He made other purchases and expenditures between 3:05 P.M. on March 11 and the time of his arrest on March 12. The total of these was in the range of $15.

This evidence was sufficient to take the case to the jury.[5] *Commonwealth* v. *Richmond*, 207 Mass. 240, 243–245, 246–247. *Commonwealth* v. *Smith*, 342 Mass. 180, 182–184. *Commonwealth* v. *Swartz*, 343 Mass. 709. *Commonwealth* v. *Connors*, 345 Mass. 102. See *Commonwealth* v. *Bonomi*, 335 Mass. 327, 356, and cases cited. "Reasonable and possible" inferences were enough. *Commonwealth* v. *Merrick*, 255 Mass. 510, 514. The jury could have found unusual opportunity, motive, possession after the crime of unexplained funds, incriminating action in leaving the house in disorder and the work unfinished, and subsequent conduct and false statements showing consciousness of

[5] The evidence as to blood stains and other stains was inconclusive. There was evidence of some blood or "blood-tinged fluid" on the right side of Mrs. Goldberg's mouth, some blood on one finger, and blood stains on the front of her blouse. There were two human blood stains on the back of the right sleeve of the defendant's shirt and blood stains, "really old blood" in the left side pocket of his trousers, and semen stains with spermatozoa on the fly. The expert witness, however, could not tell the age of any of the stains.

guilt. Evidence of consciousness of guilt, while not conclusive, may with other evidence be sufficient to prove guilt. *Commonwealth* v. *Curry,* 341 Mass. 50, 55, and cases cited. *Commonwealth* v. *Swartz,* 343 Mass. 709, 713.

This is not a case on which the guilt of the defendant is left to conjecture and surmise with no solid basis in fact, such as *Commonwealth* v. *Fancy,* 349 Mass. 196, 200. The evidence does not, as in that case, tend equally to sustain either of two inconsistent propositions. That another might have had an opportunity to commit the crime went only to the weight of the evidence. *Commonwealth* v. *Richmond,* 207 Mass. 240, 246–247. *Commonwealth* v. *Dawn,* 302 Mass. 255, 263. It is unlikely, though not impossible, that someone other than the defendant and Goldberg had the opportunity. The significance of the chain of circumstances pointing to the defendant is not destroyed because of the few moments that elapsed between the time Goldberg was seen to enter the house and his call to the police. The evidence fully justified the jury in rejecting any suggestion that he was responsible for his wife's death.

3. There was no error in the admission of photographs. *Commonwealth* v. *Gray,* 314 Mass. 96, 98, and cases cited. The colored photographs were not inadmissible because they might be considered inflammatory. *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 583–584. *Commonwealth* v. *Lamoureux,* 348 Mass. 390, 392–393. We see nothing in the point that black and white photographs, already in evidence, made the similar photographs in color inadmissible, as merely cumulative. The admissibility of this evidence lay in the discretion of the trial judge. *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 279. Nothing suggests that it was abused.

4. There was no error in the other rulings on evidence.

(a) Dr. David C. Dow testified that he "had not done enough examinations to warrant an expert opinion as to the length of time spermatozoa may remain intact." There could have been no basis for his answering the excluded question as to how long in his opinion spermatozoa will remain intact.

(b) Arthur J. McBay, State police chemist, testified that if two garments were in contact it was possible that the fibers of one would adhere to the other, and if "one took the two garments and rubbed them together and observed them under the microscope, and saw anything . . . [he] would say  yes" to the question whether a microscopic examination would reveal "adhesion between the garments." An ensuing question whether "there would be any adhesion" between the fabric of the defendant's trousers and Mrs. Goldberg's skirt was rightly excluded as involving speculation as to whether there was any contact. In later testimony the witness stated he had never seen evidence of fiber transfers.

(c) Dr. Arthur E. O'Dea testified that Mrs. Goldberg in his opinion could have died "anywhere from a relatively few minutes prior to her being found, or seen, at 5:00 o'clock, back two hours, possibly three hours. . . . The likelihood would be from 3:00 o'clock until shortly before 5:00." He could not "pinpoint . . . [it] more closely than between a few minutes before 5:00 o'clock and at the earliest 2:00 o'clock." This was objected to as speculative and was struck as too general, the judge observing, and the defendant's counsel agreeing, that the testimony "more or less agrees with what the other doctors testify." Dr. David C. Dow, for example, had testified that in his opinion Mrs. Goldberg had died between 2 P.M. and 5 P.M. when he first saw the body. The witness then testified without objection that Mrs. Goldberg could have met her death "within minutes of the time she was found." Part of the struck testimony was in terms of probability and admissible but there was no harm to the defendant in view of the other like testimony that established the probable time within which death occurred.

(d) Whether questions might be put to several witnesses asking if the defendant appeared "normal" or "relaxed" was for the judge. Descriptions of observed appearance are often "compound[s] of fact and opinion" and not inadmissible. *Commonwealth* v. *Bonomi*, 335 Mass. 327, 339.

*Kane* v. *Fields Corner Grille, Inc.* 341 Mass. 640, 647. But where, as here, there was no unreasonable restriction on the opportunity of the witnesses to describe what they observed of the defendant's appearance, the admission or the exclusion of particular words suggested by the examiner lay in the sound discretion of the court. No further comment is needed as to the question, "Did you notice any unusual activity by the defendant?"

(e) The expected answer to an excluded question to the defendant's landlady as to the substance of a conversation on Saturday, March 9, two days before the murder, was not stated to the judge. Its relevance is purely speculative.

(f) Permitting repetition by the district attorney of a question once responded to by the answer that the witness did not remember is, of course, proper in the judge's discretion.

(g) There was no error in permitting Cartwright, with whom the defendant was riding in an automobile on the evening of March 11, 1963, to testify as to certain things that the defendant said. There was in them, in context, a basis of an inference of consciousness of guilt. See *Commonwealth* v. *Swartz*, 343 Mass. 709, 713. The directions to "slow down" and "go faster, they are still here," were given on Northampton Street where the defendant lived and where the police went that night.

(h) There was no basis for striking the testimony of Joseph McMillan who sold the defendant whiskey on the night of March 11, 1963, and saw him with a ten dollar bill, a five dollar bill and some one dollar bills. This testimony and that of others tended to show that the defendant had possession of more money than he had accounted for to the police when questioned.

(i) Goldberg testified that he had consulted a doctor prior to March 11. The defendant questioned the materiality of the inquiry and the judge ruled not "to get too far into it, unless something else is shown." The witness was then allowed to testify that the event happened a few weeks before. No basis of claim of error is shown or suggests itself.

(j) It was within the judge's discretion to exclude as remote certain records of the Division of Employment Security concerning domestic workers previously employed by Mrs. Goldberg. A list of the names of all these workers was already in evidence. It was agreed that the defendant had never before gone to Mrs. Goldberg's house.

(k) Whether Robert C. Currie, the driver of the bus from Belmont to Park Circle, had on other occasions observed passengers board the bus for Park Circle when their desire was to go to Cambridge (a mistake that the defendant made) was not so directly related to the issues as to require its admission. In any case the defendant's conduct in taking the wrong bus was as reasonably related to mistake as to confusion caused by a sense of guilt.

(l) Although a conversation between the defendant and a companion on the evening of March 11 about a television set was at first excluded, the entire conversation was then immediately admitted on the issue of credibility.

(m) A police officer testified that the defendant had not requested a lie detector test in his presence. The excluded question was: "If he had requested . . . [the] test, would you have heard it?" The defendant shows no right to an answer to and no prejudice in the exclusion of this hypothetical inquiry.

(n) There was no error in striking the hearsay testimony of Lieutenant Hubert C. Maguire that the contents of certain sewers along Pleasant Street, Belmont, were investigated within a few days of March 11, 1963. Later the chief of police testified that the sewers had been drained and they revealed no missing property.

(o) There was no error in refusing to let the defendant's counsel cross-examine Dr. Leo A. Blacklow as to the appearance of the place of the murder in the late afternoon of March 11, 1963, by the use of a photograph identified as a picture of the room as it appeared on the morning of that day. Full and fair examination of the witness was in no way impeded.

5. There was no error in the charge. (a) The evidence was such that the judge could not have told the jury that

the testimony of McMillan identifying the defendant as the purchaser of liquor did not permit the inference that the purchaser was the defendant. Of course he could not be required to charge on isolated bits of evidence. A request is not a substitute for a motion to strike. (b) Although requests No. 5[6] and No. 16[7] were not given in terms, the substantive principles to which they relate were adequately covered in the clear and complete instructions given by the judge to the jury. *Commonwealth* v. *Monahan*, 349 Mass. 139, 170–171. (c) Request No. 21 was inapplicable to the evidence.[8]

6. The trial judge did not abuse his discretion in denying the defendant's motion for a new trial.

The closing arguments were made on November 22, 1963. The argument of the defendant's counsel ended about 12:45 P.M.; that for the Commonwealth began about 2 P.M. and ended about 3:15 P.M. Thereupon the judge told the jury of the assassination of President Kennedy and of his decision to continue with the case, and cautioned them not to let their decision be affected by the national disaster.[9]

---

[6] "The plea of 'Not Guilty' involves a denial of every material allegation in the indictment, and the Commonwealth is bound affirmatively to prove every essential allegation beyond a reasonable doubt."

[7] "That all the facts proved must be consistent with each other, and with the main fact sought to be proved. When a fact has occurred, with a series of circumstances preceding, accompanying, and following it, we know that they must all have been once consistent with each other; otherwise, the fact would not have been possible. Therefore, if any one fact necessary to the conclusion is wholly inconsistent with the hypothesis of the guilt of the accused, it breaks the chain of circumstantial evidence upon which the inference depends; and, however plausible or apparently conclusive the other circumstances may be, the charge must fail."

[8] "Evidence which does not go beyond showing that defendant had an opportunity to commit a crime is insufficient."

[9] "Now, I have a very sad duty, gentlemen. I don't know whether you have yet heard. Some in the courtroom have heard that early this afternoon, one or more assassins in Texas, apparently from high up in a building, fired shots at some of our officials. They hit the President, the Vice President, and the Governor of Texas, and the President early this afternoon died. I ask everyone in the room to rise. [The assembly stood briefly.] . . . I had, and still have a very grave responsibility thrust on me. The other sessions of the Superior Court, at least on the civil side, adjourned for the day. During the mid-afternoon recess, I was faced with a question of whether we should. I thought fast. I am willing to take the responsibility. You have been here — we have all been here for almost three weeks. And you have been, on my earlier assertions — which this tragic mishap has interrupted, going to have

He then adjourned court until 8:30 A.M. November 23.
Soon after that time, on Saturday morning, he began his
charge.   The jury retired to deliberate at 11:25 A.M.   In
the meantime, during the overnight recess, they may have
seen some of the events in Dallas on television.[10]

The defendant did not except to the judge's remarks on
November 22, nor to the decision to go forward with the
case.

The remarks of the judge were appropriate.   The deci-
sion to continue the case on the next day, words of caution
having been spoken, was within the judge's wise discretion.
We see no basis for a ruling of risk of prejudice that made
the trial unfair, either in the events or in reports or pic-
tures of them.   We do not assume that jurors, properly in-
structed, would be unable to put aside their feelings of hor-
ror and revulsion over the murder of the President while
determining whether a particular person has been proved
to be guilty of another murder.   In any case such as this
the jury must be counted on not to let the shocking na-
ture of a crime affect their judgment of whether the evi-

the case tomorrow, and then after your verdict, go back to your homes.   I
venture to think that if the President were here, and I were there, he would
do what I am doing.   We are going ahead, but we are going ahead in thought-
ful sorrow about what has transpired.   Now also, of course, I had to consider
the possibility that this event might in some way affect one or more of you
to an extent that you could not render a fair verdict.   But I have watched
you gentlemen, and I think you are men of sufficient mental integrity not to
let this influence you in any way in the decision of this case anymore than I
know that you are not going to let this shooting of policemen that has been
going on, influence you in any way in deciding this case.   This case is on its
own evidence, and on the arguments that have been ably presented to you, and
so we are going forward, and will you please, if you have to, make every effort
to be sure that your decision in this case is in no way tainted by the national
disaster that has struck us.''

[10] The judge, on November 5, 1963, after thirteen of the fourteen jurors
had been chosen, said at the close of that day's session: ''The other thing is
that the officers have arranged in your rooms to have television.   Now, as you
have been told, that is on the honor system.   The minute you hear something
coming on T.V., or radio, if you have one, about this trial, you are to tune it
off and not listen until that is off the air, because the point is that if you —
and of course in the newspapers you read, all references to this trial will be
cut out by the officers, but the idea of that is that you are to decide this case
on the evidence that you hear in court, and not anybody else's report, or the
T.V. or radio or press, as to what has gone on.   So please observe that care-
fully.''   The defendant took no exception to this statement or the arrange-
ment then made.

dence shows that the defendant committed it. Knowledge of another shocking crime is, of course, a more remote circumstance.

We have examined the entire transcript and record and see no basis in justice for ordering a new trial. See G. L. c. 278, § 33E.

*Judgment affirmed.*