## Commonwealth *vs.* Lord Hampton.

Suffolk. January 8, 2010. - June 30, 2010.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Telephone. Arrest. Jury and Jurors. Criminal Offender Record Information. Constitutional Law,* Jury, Access to criminal records. *Practice, Criminal,* Motion to suppress, Jury and jurors, Investigation of jurors.

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress a statement that he gave to police, on the ground that the police had not advised him of his right to use a telephone on arrival at police headquarters or permitted him to use a telephone within one hour of his arrest, in violation of G. L. c. 276, § 33A, where, given that the judge correctly found that the defendant was not arrested until after he had completed his tape-recorded statement and the defendant was not thereafter interviewed, any violation of the statute did not require suppression, in that the police did not obtain anything to assist the prosecution of their case by violating the statute. [154-159]

There was no merit to the criminal defendant's claim that the judge at his trial created structural error by denying the defendant's motion seeking access to the criminal offender record information (CORI records) of all jurors following the prosecutor's check of CORI records regarding four jurors after they had been sworn and had heard testimony, where the defendant did not show actual or implied juror bias. [162-165]

At a criminal trial, the judge acted within her discretion under G. L. c. 234A, § 39, to dismiss a juror in the best interests of justice for the juror's failure to comply with an order that jurors not discuss the case with other jurors, and, even assuming that the judge's subsequent denial of the defendant's motion seeking access to the criminal offender record information (CORI records) of all jurors (following the prosecutor's check of the CORI records regarding four jurors, including the dismissed juror, after they had been sworn and had heard testimony) were error, the defendant failed to show the requisite harm under either constitutional or common-law analysis. [165-169]

Statement of the limits on a prosecutor's independent authority to conduct checks of criminal offender record information of jurors under G. L. c. 6, § 172. [169-171]

Indictments found and returned in the Superior Court Department on December 29, 1999.

A pretrial motion to suppress evidence was heard by *Regina L. Quinlan,* J., and the cases were tried before *Nancy S. Holtz,* J.

Commonwealth *v.* Hampton.

*Chauncey B. Wood* for the defendant.

*Helle Sachse*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of the September 28, 1999, murders of a fourteen year old girl (victim) and her eight month old fetus, both on theories of deliberate premeditation and extreme atrocity or cruelty. On appeal he asserts error in the denial of his motion to suppress the statement he gave to Boston police, allegedly because they violated his right under G. L. c. 276, § 33A, to make a telephone call; and in the denial of his request to obtain criminal records of jurors after the Commonwealth obtained criminal records of four jurors and after the jury were sworn. We affirm the convictions and decline to grant relief under G. L. 278, § 33E.

1. *Background.* We summarize the evidence at trial on which the jury could have returned their verdicts. On September 28, 1999, the victim failed to return home. The next day her family reported her missing. On November 2, 1999, the investigation led police to a site on the grounds of the former Boston State Hospital, where they unearthed the victim's body from a grave approximately twenty-eight inches deep. The medical examiner who performed the autopsy testified that the victim died as a result of the combination of multiple stab wounds and suffocation from being buried alive. Her fetus died as a result of asphyxia, a lack of oxygen caused by the death of the victim.

Police questioned the defendant at Boston police headquarters on November 4, 1999. The defendant gave a tape-recorded statement in which he described his assistance in the killings. He said that Kyle Bryant,[1] a long-time friend, asked him to help kill the victim because Bryant was concerned that, as the father of the child she carried, he would be charged with statutory rape and face a lengthy prison sentence. The defendant told police that Bryant took him to a place on the property of the former Boston State Hospital where Bryant had started digging

---

[1]Kyle Bryant also was indicted for the murders. He was tried separately six months before the defendant, and was acquitted. The Commonwealth proceeded against the defendant as a joint venturer. The so-called "rule of consistency" does not require the defendant's convictions to be reversed where the only other joint venturer has been acquitted in a separate trial. See *Commonwealth* v. *Fluellen*, 456 Mass. 517, 520 (2010).

the grave in which he intended to bury the victim after he killed her. The defendant said he refused Bryant's request that the defendant help him dig the grave.

Later that day, September 28, 1999, Bryant gave the defendant a pillowcase containing a kitchen knife, and told him to go to the grave. The defendant told police that when he arrived, he threw the knife and pillowcase near the hole. Bryant lured the victim to the site. The defendant could hear her crying, "No, Kyle. Please. No," but he was about twenty feet away and could not see what was happening in the dark. He denied stabbing the victim. He saw Bryant drag her through the dirt and drop her in the grave. The defendant said he pushed dirt onto the victim with his hands while Bryant jumped on her, shouting, "Hurry up and die, bitch." The victim was gasping for air as the defendant continued covering her with dirt, now with a shovel.

The defendant recounted that he threw the shovel into some nearby bushes, and that the two men buried the pillowcase with the victim. The defendant did not know what became of the knife. Police found the shovel in bushes near the grave, and the pillowcase was recovered near the body. The knife was never found.

The defendant told police he had discussed the killings with Tracy Howard. Howard confirmed this, but testified the defendant told him he killed the victim and Bryant "was there." Between 3 and 3:30 P.M. on November 4, 1999, the defendant telephoned April Peebles, a woman with whom he had occasionally stayed, and told her he was present when Bryant killed the victim in late September.

The defendant testified at trial. He denied any involvement in the victim's death. He said he made the statement to police because he believed that that was what they wanted to hear, and he just wanted to go home. The defendant presented expert testimony that the cause of death of the victim was multiple stab wounds, with no contribution from suffocation. The parties presented experts with opposing views about whether the victim was alive when she was buried, based on the absence of insect activity in or about her body.

2. *Motion to suppress.* The defendant assigns error to the denial of his motion to suppress the statement he gave to police

on November 4, 1999. He relies on an incident report and a booking form as irrefutable proof that he was arrested at 10:30 A.M. on November 4, and he argues that because he was neither advised of his right to use a telephone forthwith on arrival at police headquarters nor permitted to use a telephone within one hour of his arrest, in violation of G. L. c. 276, § 33A,[2] the statement he made beginning at 12 P.M. and ending at 12:55 P.M. on November 4 must be suppressed.

The exclusionary rule applies to intentional deprivation by police of a defendant's rights under G. L. c. 276, § 33A. *Commonwealth* v. *Jones*, 362 Mass. 497, 502-504 (1972). A defendant must show that the denial of his right to the use of a telephone was intentional. *Commonwealth* v. *Scoggins*, 439 Mass. 571, 578 (2003). A defendant's rights under the statute are triggered by his formal arrest, not by the custodial nature of any prearrest interrogation. *Commonwealth* v. *Rivera*, 441 Mass. 358, 374-375 (2004).

When reviewing a decision on a motion to suppress we accept the motion judge's findings of fact, absent clear error. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). We exercise our "independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found.' " *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), *S.C.*, 398 Mass. 806 (1986), quoting *Brewer* v. *Williams*, 430 U.S. 387, 403 (1977).

We summarize the judge's findings of fact from the hearing on the motion to suppress. On November 1, 1999, police interviewed Bryant, who implicated the defendant, but not himself, in the killing of the victim. He led police to the grave where he thought she was buried, but it was too dark for police to do anything that night.

On November 2, the defendant appeared unexpectedly at the

---

[2]General Laws c. 276, § 33A, states: "The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

Area B3 police station in the Mattapan section of Boston, looking for Bryant. Detectives spoke with the defendant for approximately five hours and forty minutes. He was concerned because the victim's family accused him of killing her, and they said Bryant "ratted" him. The victim's body had been found earlier that day. The defendant denied having anything to do with her disappearance or burial. He told detectives that Bryant was concerned he might be incarcerated for statutory rape related to the victim's pregnancy. He also told detectives that Tracy Howard told him that Bryant was responsible for the victim's disappearance. After the interview he left the station.

On November 3, detectives spoke again with Bryant. He gave a statement in which he said he was present when the defendant killed the victim. Bryant was arrested for murder. The next morning Sergeant Detective Daniel Keeler telephoned the defendant's stepfather at his place of employment and said the police wanted to speak to the defendant again. The defendant's stepfather went home, where he saw detectives waiting in their car. He entered his house and told the defendant the detectives had asked to speak to him. The defendant got dressed and walked outside with his stepfather. The three detectives were Dennis Harris, James Doyle, and Paul McLaughlin. Harris asked the defendant if he would accompany them to headquarters for a further interview, and he agreed. He was not handcuffed or otherwise restrained, and he went with the detectives voluntarily. The defendant was aware of the nature of the police investigation: during his interview two days earlier, detectives had asked him if he was involved in the victim's death, and he was aware that members of the victim's family were blaming him for her death. He understood that he was not under arrest, and testified at the suppression hearing that he spoke with Harris to avoid being arrested.

At headquarters, the defendant was taken to a conference room and given the Miranda warnings at 11:07 A.M. He said he understood his rights and signed a waiver of rights form. Detective Harris conducted a "pre-tape interview" until noon, at which time the defendant agreed to give a tape-recorded statement. Detective Doyle was present. The tape-recorded interview ended at 12:55 P.M.

After completing the recorded interview, Harris sought and

obtained authorization from the district attorney's office to arrest the defendant for the two murders. It is not clear precisely when after 12:55 P.M. the defendant was arrested. The judge found that the defendant "was arrested at Headquarters and transported shortly after 4 P.M. to the Area B3 station, where he was booked at 4:45 P.M." and advised of his right to use a telephone. The judge found there was a period of more than one hour between arrest and booking, at which time the defendant was advised of his right to use a telephone, but she also found that this failure to comply with the one-hour requirement of G. L. c. 276, § 33A, was inadvertent. She further found that once the defendant was arrested, there was no further interrogation.

Although the booking sheet indicates the defendant was arrested at 10:30 A.M., the judge found that it was completed by the booking officer at the Area B3 station, and not by the detectives.[3] The judge implicitly found that the incident report, which also states that the defendant was arrested at 10:30 A.M., is incorrect. Detective Paul McLaughlin, who prepared that report, testified that the time of arrest that appears on that report is a mistake. Detective McLaughlin did not participate in the interview of the defendant at headquarters.

The judge heard other testimony as to the time of arrest, namely, the testimony of Detectives Harris and Doyle, and that of Sergeant Detective Daniel Keeler, who described a protocol that is followed in homicide cases in Boston during the course of an ongoing investigation. That protocol requires detectives to go through the chain of command to obtain permission to arrest from the assistant district attorney assigned to the investigation. The judge found that the protocol was followed in this case, and that the defendant was not arrested until after he had completed his recorded interview, and permission had been sought and obtained for his arrest.

The judge's findings are supported by the record. She was entitled to reject the time of arrest as stated in the two documents and credit the testimony of the police officers as to when

---

[3]The booking officer testified that he recorded the time of arrest based on information provided by others. The transporting officer testified that she gave the booking officer the incident report. That report indicated the time of arrest was 10:30 A.M.

the arrest actually occurred. Her resolution of this dispute is classic fact finding, which "is the function and responsibility of the judge who saw the witnesses, and not this court." *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980).

The elements of an arrest are (1) "an actual or constructive seizure or detention of the person, [2] performed with the intention to effect an arrest and [3] so understood by the person detained." *Commonwealth* v. *Cook*, 419 Mass. 192, 198 (1994), *S.C.*, 447 Mass. 1023 (2006), and *S.C.*, 451 Mass. 1008 (2008), quoting *Massachusetts Gen. Hosp.* v. *Revere*, 385 Mass. 772, 778 (1982), rev'd on other grounds, 463 U.S. 239 (1983). See *Commonwealth* v. *Obershaw*, 435 Mass. 794, 802 (2002). With respect to the first element, the judge found that the detectives never seized or otherwise restrained the defendant until he had finished his recorded statement. Addressing the second element, the judge found that on the morning of November 4, the detectives intended to request a second interview with the defendant. They disbelieved his first statement, in which he had denied any involvement in the killings, because it conflicted with statements they had obtained from Bryant and Howard. Based on the information they gained from their investigation, the detectives had context with which they could conduct a more meaningful interview. Thoroughness and experience counselled patience. It was not until the detectives obtained the defendant's November 4 statement that they acted with the intent to make an arrest. They followed the requisite protocol to obtain permission from the district attorney's office. The judge found that, with respect to the third element, the defendant understood at the time he went with the detectives to headquarters and while he was giving his statement that he was not under arrest. He testified that he spoke to police on November 2 because he believed he could avoid being arrested by doing so. Based on that same belief, he spoke to Harris on November 4. None of the three elements of a formal arrest was present until after the district attorney's office authorized the arrest, which occurred sometime after 12:55 P.M. on November 4. The judge correctly ruled that the defendant had not been arrested until his tape-recorded statement had been completed.

Where the judge found that the defendant was not arrested until after 12:55 P.M., and that he was not thereafter interviewed, any violation of G. L. c. 276, § 33A, does not require suppression. The police did not obtain anything to assist the prosecution of their case by violating the statute. There is no justification to suppress evidence lawfully obtained and having no nexus to the denial of the defendant's statutory right to use the telephone. His statutory right to use a telephone did not accrue until he was formally arrested. See *Commonwealth* v. *Bouchard,* 347 Mass. 418, 420-421 (1964). In addition, the defendant failed to show that the delay was intended to help police obtain his statement before he could secure counsel or emotional support from friends or relatives. See *Commonwealth* v. *Jones,* 362 Mass. 497, 503 (1972). There was no error in the denial of the motion to suppress.

3. *Jury issues.* Eighteen jurors were selected by agreement of the parties. The selection process took five days. At the end of the fifth day the judge distributed a document to each juror that contained a multipart order that she also read aloud. The order included requirements that jurors not discuss or otherwise communicate with anyone about any aspect of the trial; and if any juror has any difficulty complying with the order, or has received a communication that he or she believes may be in violation of the order, the juror must advise the court by going through a court officer, and the juror "[shall] not speak to any fellow juror regarding anything relating to the communication." The fifth day was a Friday, and the jury were not sworn until the following Monday, at the beginning of the sixth day of trial.

The sixth day of trial was spent on a view, opening statements by both counsel, and the playing of the defendant's tape-recorded statement to police, which was admitted in evidence through the Commonwealth's first witness. At the end of the sixth day the judge reminded the jurors of her orders, in summary fashion. She instructed the jurors not to discuss the case among themselves or with anyone else, and not to read or listen to anything in any form of news media, including the Internet.

At the beginning of the seventh day of trial the judge brought to the attention of counsel that a court officer reported to her that a juror (juror A) saw someone on the train reading a news-

paper that contained a photograph of the jury on the view. While juror A was expressing his concern to other jurors that a photograph of the jury appeared in a newspaper the court officer intervened. He took juror A aside and asked him to explain privately what happened, then reported the matter to the judge. The judge proposed to inquire of juror A, as well as the other jurors, what was seen in the newspaper, what was discussed among jurors, and whether they complied with her orders. The judge also found that the newspaper photograph had been taken from such a distance that jurors' faces were not identifiable. She solicited input from counsel.

The prosecutor then informed the judge that he had checked the criminal backgrounds of several younger jurors, based on their "facial reactions" the day before during the opening statements and the playing of the defendant's tape-recorded statement to police. The prosecutor indicated that juror A and another juror (juror B), two of the jurors whose backgrounds he had checked, and an immediate family member of juror B, had criminal histories, including convictions or pending cases, or both, which they failed to disclose on their confidential juror questionnaires. Copies of the criminal offender record information (CORI records) of jurors A and B, and B's husband, obtained by the prosecutor pursuant to G. L. c. 6, § 172, were marked for identification and copies were provided to defense counsel. The prosecutor asked that jurors A and B be removed for cause. Defense counsel asked that the prosecutor be ordered to disclose whether he had requested CORI records of any other jurors, and to surrender all information thereby obtained. The judge declined to order the prosecutor to disclose anything about the background checks he had requested.[4] Defense counsel also requested that the court provide him with the CORI records of all jurors.

The judge inquired of juror A as to the newspaper photograph he had seen, and his conversation with other jurors. Juror A said he happened to be sitting in a train next to a person reading a newspaper that contained a photograph of several jurors taken during the view. Juror A was concerned because he understood

---

[4] At the beginning of the eighth day of trial the prosecutor asked that the record reflect specifically that he had arranged for record checks to be run on four jurors: A (age forty-one), B (age twenty-four), and two others (ages twenty-four and twenty-five).

that, for safety reasons, no photographs of jurors would appear in the news media. He mentioned the photograph to one of the jurors he recognized in the photograph. He said the juror told him he was not concerned because his girl friend had informed him that only his footwear, which was distinctive, appeared in the photograph.[5] Juror A indicated that he understood the judge's order prohibiting the jurors from discussing the case. The judge determined that she would excuse juror A from further service based on his violation of her order not to discuss the case with anyone.

The judge never discussed with juror A the criminal history information obtained by the prosecutor. That information (which was not verified) indicated that juror A had a criminal record of convictions in Florida and cases pending in Massachusetts. The convictions involved crimes of aggravated assault with a weapon, distribution of cocaine, sale of cocaine, burglary, resisting arrest, grand theft, and other crimes, and he was adjudged a habitual criminal. His Florida conviction of grand theft was a felony conviction that occurred within seven years.[6] See Fla. Stat. Ann. § 812.014 (West 2007 & Supp. 2010). Although the judge did not address juror A's failure to include his criminal history on his confidential juror questionnaire, see G. L. c. 234A, § 22, or his disqualification from jury service pursuant to G. L. c. 234A, § 4 (7) (having felony conviction within past seven years, or being defendant in pending felony case), she indicated that these factors probably provided an independent alternative basis to dismiss juror A.

The judge conducted an individual voir dire of the other seventeen jurors and found no basis to discharge any of them.[7]

She questioned juror B with respect to criminal history information provided by the prosecutor. Specifically, the judge

---

[5]Juror A identified a duplicate copy of the newspaper and the photograph he saw, and they were marked for identification.

[6]General Laws c. 234A, § 4 (7), inserted by St. 1982, c. 298, § 1, in effect at the time, created a disqualification from jury service for felonies committed within seven years of the receipt of the juror summons, or for being a defendant in a pending felony case.

[7]The judge addressed the jury after the voir dire and "assure[d]" them that, based on her examination of the photograph that appeared in the newspaper, "not a single juror was visible in an identifiable way in any way, shape, or form."

showed juror B her confidential questionnaire and explained that the words "involvement . . . in a civil or criminal case" meant something broader than conviction. She then asked the juror whether, with that explanation in mind, her answer on the questionnaire regarding involvement in civil or criminal cases might now be different. Juror B then described her criminal history. The judge found that juror B unintentionally omitted from her confidential juror questionnaire certain information about herself and her husband that she was required to disclose under G. L. c. 234A, § 22. Neither juror B nor her husband had any convictions. The prosecutor indicated he would have exercised a peremptory challenge as to juror B, but acknowledged he no longer had that right. See Mass. R. Crim. P. 20 (c) (2), 378 Mass. 889 (1979) (peremptory challenge must be made before juror is sworn). Defense counsel indicated he was satisfied with the manner in which the judge conducted the voir dire of juror B.

Defense counsel did not object to the retention of the seventeen jurors, but he did object to the discharge of juror A on the grounds that he did not think juror A violated the judge's order prohibiting jurors from discussing the case. See note 11, *infra*. He further objected to the judge's failure to inquire of juror A if he was in fact the same person whose criminal record was brought to the judge's attention by the prosecutor.

a. *Structural error.* During oral argument the defendant claimed for the first time that the judge created structural error by denying him access to the CORI records of all jurors. We requested supplemental briefing on the issue. The defendant now contends that, although not strictly a violation of his right to an impartial jury, the denial of his request[8] for the CORI records of all jurors constituted a denial of fundamental fairness under the due process clauses of the Federal and Massachusetts Constitutions, and undermined his right to an impartial jury. He relies on *Commonwealth* v. *Susi*, 394 Mass. 784 (1985), for the proposition that structural error in the jury selection process is created by a ruling that undermines the fairness of that *process*, without any need to show that a potentially biased juror was seated.

---

[8]Although there is a dispute whether the issue has been preserved for our review, we are satisfied that it has been preserved.

Structural error is a particular type of error. Generally, it is error that "necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Washington* v. *Recuenco*, 548 U.S. 212, 218-219 (2006), quoting *Neder* v. *United States*, 527 U.S. 1, 9 (1999). Structural errors are fundamental defects in a trial. They have been recognized in limited circumstances, occur rarely, and require automatic reversal without a showing of actual harm. *Washington* v. *Recuenco, supra* at 218 & n.2 (listing cases where structural error found). In the context of this case, structural error is error that denies a defendant his "right to an impartial adjudicator, be it judge or jury." *Gomez* v. *United States*, 490 U.S. 858, 876 (1989), quoting *Gray* v. *Mississippi*, 481 U.S. 648, 668 (1987). On a claim of structural error alleging that a jury were not impartial because a particular juror was biased, the defendant must show actual or implied juror bias. See *Smith* v. *Phillips*, 455 U.S. 209, 215-217 (1982); *Commonwealth* v. *Laguer*, 410 Mass. 89, 99 (1991); *Commonwealth* v. *Amirault*, 399 Mass. 617, 625-626 (1987). If the defendant is able to show such bias, the error is structural and he need not show that the verdicts were thereby affected.

The defendant acknowledges that he has not shown that the members of his jury were not impartial. Rather, he contends that the *process* by which the jury were selected was fundamentally unfair, and therefore the jury cannot be said to be impartial. This argument misses the mark. He must show bias. The process by which the jury were selected does not necessarily determine whether there has been structural error.[9] A recent United States Supreme Court case is instructive when analyzing whether an error is structural. In *Rivera* v. *Illinois*, 129 S. Ct. 1446, 1454 (2009), the Court held that there is no structural error, in the Federal constitutional sense, in a State court's good faith error that causes a defendant to lose a peremptory challenge where the jury are composed of qualified individuals not challengeable for cause. The Court noted that there is no freestanding con-

[9]The defendant does not allege structural error based on improper jury selection criteria. Cf. *Vasquez* v. *Hillery*, 474 U.S. 254, 263-264 (1986) (conviction reversed where grand jury selected on basis of race); *Davis* v. *Georgia*, 429 U.S. 122 (1976) (per curiam) (juror excluded based on general views against death penalty).

stitutional right to peremptory challenges. See *id.* at 1453, citing *United States* v. *Martinez-Salazar*, 528 U.S. 304, 311 (2000). They are a creature of statute. See *Ross* v. *Oklahoma*, 487 U.S. 81, 89 (1988). As such, States may withhold peremptory challenges "altogether without impairing the constitutional guarantee of an impartial jury and a fair trial." *Georgia* v. *McCollum*, 505 U.S. 42, 57 (1992). See *Rivera* v. *Illinois, supra.* The Court approved the reasoning of the Illinois Supreme Court where it said that although "peremptory challenges are '*one* means of assuring the selection of a qualified and unbiased jury,' " they are not "indispensable to a fair trial." *Id.* at 1452, quoting *People* v. *Rivera*, 227 Ill. 2d 1, 16 (2007), and *Batson* v. *Kentucky*, 476 U.S. 79, 91 (1986).

The Court concluded its decision in *Rivera* by stating that States are free to decide whether an erroneous denial of a peremptory challenge requires automatic reversal under State law. *Rivera* v. *Illinois, supra* at 1456. We have held that "the erroneous denial of the right to exercise a proper peremptory challenge is reversible error without a showing of prejudice." *Commonwealth* v. *Susi*, 394 Mass. 784, 789 (1985), quoting *Commonwealth* v. *Wood*, 389 Mass. 552, 564 (1983).[10]

We continue to adhere to the view that, for purposes of State law, the erroneous denial of a peremptory challenge requires automatic reversal, without a showing of prejudice. Acknowledging the "venerable" history of peremptory challenges in State court jurisprudence, the Supreme Court has said that "that device occupies 'an important position in our trial procedures,' . . . and has indeed been considered 'a necessary part of trial by jury . . . .' Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of 'eliminat[ing] extremes of partiality on both sides,' . . . thereby 'assuring the selection of a qualified and unbiased jury.' " *Holland* v. *Illinois*, 493 U.S. 474, 484 (1990), quoting *Batson* v. *Kentucky, supra* at 91, 98, and *Swain* v. *Alabama*, 380 U.S. 202, 219 (1965). We, too, have recognized

_____

[10]The United States Supreme Court has disavowed the statement in *Swain* v. *Alabama*, 380 U.S. 202, 219 (1965), on which is based the holding in *Commonwealth* v. *Wood*, 389 Mass. 552, 564 (1983). See *Rivera* v. *Illinois*, 129 S. Ct. 1446, 1455 (2009).

the time-honored importance of peremptory challenges. Based on the need "[t]o eliminate those jurors perceived as harboring subtle biases with regard to the case, which were not elicited on voir dire or which do not establish legal cause for challenge, the parties have been permitted to exercise peremptory challenges on no more than the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another.' " *Commonwealth* v. *Soares*, 377 Mass. 461, 483-484, cert. denied, 444 U.S. 881 (1979), quoting 4 W. Blackstone, Commentaries 353 (1807).

That said, criminal records of prospective jurors do not enjoy such a history, and they are not an indispensable or necessary means to the selection of an impartial jury, as a matter of Federal or Massachusetts constitutional law. Consequently, we do not consider the denial of the defendant's request for criminal records of jurors to be structural error.

Contrary to the defendant's claim, the fact that the prosecutor made only a selective search of jurors' CORI records is of no avail. The prosecutor could have done that before empanelment, and he would only have had to "share[]" with the defendant the records he obtained. *Commonwealth* v. *Cousin*, 449 Mass. 809, 818 (2007), cert. denied, 553 U.S. 1007 (2008) (*Cousin*). That is what occurred here. The prosecutor's obtaining of some jurors' CORI records does not give rise to a constitutional right of the defendant to obtain CORI records of other jurors. The defendant could have moved, subject to the judge's discretion, for CORI records of venire members before trial based on the information contained on the list of potential jurors that the jury commissioner is required to deliver to the clerk of court at least ten days before trial. See G. L. c. 234A, § 67. Alternatively, the defendant could have moved for the CORI records of the eighteen venire members selected before they were sworn. However, he has no freestanding constitutional right to obtain such records.

b. *Due process.* The defendant argues that the judge denied him due process of law when she rejected his request for access to the criminal records of all jurors after the prosecutor had selectively obtained the criminal records of four jurors. At trial defense counsel urged the judge to order the prosecutor to surrender all CORI records he obtained, and alternatively, that the

court provide him with CORI records of all jurors. He argues now, as he did in the trial court, that the Commonwealth unfairly extended the juror selection process by utilizing information to which it, but not the defendant, had access; and that the information was obtained to target jurors that the prosecutor disfavored.

Rule 20 (c) (2) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 889 (1979), sets the outer time limit for the exercise of peremptory challenges as "before the jurors are sworn." See *Commonwealth* v. *Johnson,* 426 Mass. 617, 626 (1998). Rule 20 (b) (3) requires challenges for cause to be made "before the juror is sworn to try the case." That rule further provides that "[t]he court may for cause shown permit a challenge [for cause] to be made after the juror is sworn but before any evidence is presented." The prosecutor's request that jurors A and B be removed for cause was made after the jury selection process had been concluded. There is no authority to extend jury selection for any reason beyond the point at which evidence is presented.

Apart from the jury selection process, a judge has "discretionary authority to dismiss a juror *at any time* in the best interests of justice" (emphasis added). G. L. c. 234A, § 39. We have affirmed a judge's exercise of such discretion after the jury were sworn and after evidence was presented, where the parties learned by chance that some jurors may have an undisclosed bias against a party. *Cousin, supra.* In that case, the prosecutor conducted a check of CORI records of all the jurors when a problem arose unexpectedly during jury deliberations. Five jurors had significant criminal histories that they had failed to disclose on their confidential juror questionnaires. After three of those jurors were discharged, a mistrial was declared for want of sufficient jurors. *Id.* at 810-811. Because the defendant in that case claimed that double jeopardy barred a retrial, we were required to decide whether the prosecutor acted with the intent to cause a mistrial. *Id.* at 819. See *Oregon* v. *Kennedy,* 456 U.S. 667, 676 (1982); *Commonwealth* v. *Andrews,* 403 Mass. 441, 448 (1988). We affirmed the trial judge's finding that there was no evidence that the prosecutor had acted improperly, and we held that, in the circumstances, "the prosecutor was authorized to check the records and bring them to the court's attention." *Cousin, supra* at 815-816. We emphasized that there was "no

suggestion . . . the prosecutor knew earlier of the jurors' undisclosed criminal histories and only revealed them after he began to fear an acquittal." *Id.* at 820.

Here, the prosecutor conducted a check of CORI records of jurors with whom he had become dissatisfied. His stated reason for obtaining the CORI records was the jurors' facial reactions to the opening statements and to the defendant's tape-recorded statement. His ensuing efforts, i.e., requests to remove jurors A and B for cause, were an improper attempt to extend the jury selection process. However, no mistrial was declared and the defendant does not raise the issue of double jeopardy. Contrary to the defendant's claim, the motives of the prosecutor are not relevant, and we look only to the fairness of the trial. See *Smith* v. *Phillips*, 455 U.S. 209, 218-219 (1982) (touchstone of due process analysis is fairness of trial, not culpability of prosecutor in failure to disclose juror's application, submitted during trial, for employment in prosecutor's office).

Contrary to the defendant's suggestion, the judge did not reopen the jury selection process. She acted pursuant to her authority under G. L. c. 234A, § 39. The judge was presented with information that suggested juror B's answers on her confidential juror questionnaire concealed a bias or raised questions about her ability to follow simple instructions, hence, her competence. See *Cousin, supra* at 822. Although these circumstances sometimes arise during the jury selection process, they also may arise after that process has concluded. The question then becomes one of potential juror misconduct. See *Commonwealth* v. *Amirault*, 399 Mass. 617, 625, 627 (1987). See also *People* v. *Johnson*, 6 Cal. 4th 1, 21-22 (1993), cert. denied, 513 U.S. 844 (1994) (sleeping during trial and failing to disclose prior arrests good cause for discharge of juror). The judge had discretion to consider the matter at that time. She explored the matter discreetly to satisfy herself that juror B's failure to disclose her criminal history (and that of her husband) was unintentional, and that juror B was capable of performing her duty by following simple instructions. See *Cousin, supra* at 822; *Commonwealth* v. *Amirault, supra* at 626. Trial judges must ensure that trials are conducted fairly, and we are satisfied that the judge took appropriate measures to see that this trial was conducted fairly.

The judge's discharge of juror A was not based on that juror's failure to disclose his criminal history, but his failure to comply with the court order that jurors not discuss the case with other jurors, and not discuss with other jurors their need to report any information to the judge. It is well established that the judge had discretion to discharge juror A "in the best interests of justice," G. L. c. 234A, § 39, and we are satisfied that the judge acted within her discretion in removing juror A.[11]

There was no inquiry of the other sixteen jurors about their criminal records, if any. Because jury selection had been concluded, the defendant was not entitled to move for jurors' CORI records at that time, and the judge did not err in denying his request.

Finally, there is no recognized constitutional right to the criminal records of jurors. The common-law right to such records under *Commonwealth* v. *Smith*, 350 Mass. 600, 603-604 (1966), is limited to those records the prosecutor has obtained prior to jury selection.[12] The defendant was entitled to obtain the CORI records for juror B and her husband because the judge actually considered them. The trial transcript indicates that he received those records.

Even if there were error, we need not decide whether the defendant was denied due process or merely his common-law rights because he has failed to show the requisite harm under any analysis. The judge did not remove juror B, having concluded that her failure to report her family's criminal histories was unintentional, and the defendant did not ask that juror B or any other juror be removed. The defendant (and the prosecutor) expressed satisfaction with each juror during jury selection. The defendant has not shown juror bias, as he must. See *Smith* v.

[11]There is no merit to the claim, wisely abandoned on appeal, that juror A did not violate the "no discussion" order, and was thereby improperly discharged by the judge.

[12]In *Commonwealth* v. *Smith*, 350 Mass. 600, 603 (1966), on which the defendant relies, this court said that background information on prospective jurors obtained by the Commonwealth should be equally available to the defense during jury selection. That case was decided as a matter of our common law, based on the court's powers of "general supervision" and on the "public interest in assuring the defendant a fair trial." It was not decided on principles of due process, and the court noted that the defendant never argued that the denial of juror background information denied him a fair trial. *Id.*

*Phillips*, 455 U.S. 209, 218-219 (1982); *Commonwealth* v. *Amirault, supra* at 625. See also G. L. c. 234A, § 74 (mistrial shall not be granted or verdict set aside for defect in discharge of juror under G. L. c. 234A unless prejudice shown). There was no harm.

The defendant was tried by an impartial jury. The jury were found impartial by the judge, who was entitled to rely on their demeanor and their answers to her questions. See *Commonwealth* v. *Gregory*, 401 Mass. 437, 444 (1988). See also *Smith* v. *Phillips, supra* at 215.

We share the concerns about unevenness in access to CORI records expressed in Justice Ireland's concurring opinion in *Cousin, supra* at 824 (Ireland, J., concurring). However, that problem is largely avoided if judges, on request, order CORI records of prospective jurors during jury selection. Such orders can be limited to those jurors selected, and before they are sworn. See G. L. c. 234A, § 67. See also *Cousin, supra* (Ireland, J., concurring). That procedure is not unduly burdensome or time consuming, and we encourage judges to exercise their discretion at least as to jurors who are selected but not yet sworn.

Although a check of CORI records of selected but unsworn jurors should solve most problems, it is not a foolproof procedure. This case demonstrates that "additional constraints are necessary" to ensure the fair and orderly conduct of trials. *Cousin, supra* at 819. In the *Cousin* case, we said that the CORI records statute permits "criminal justice agencies," including the district attorney's office, to conduct criminal record checks "for the actual performance of [their] criminal justice duties." *Id.* at 816. See G. L. c. 6, § 172. "Inquiring into the criminal records of jurors in a criminal case for the purposes of determining their qualifications to serve and their impartiality fits squarely within the 'criminal justice duties' of prosecutors." *Cousin, supra*. Once the jury are sworn and the evidence begins, however, the criminal justice "duty" of selecting a qualified, impartial jury has been discharged. Thereafter, a criminal record check of jurors on grounds of failure to disclose his or her criminal record or other requested information on a confidential juror questionnaire or during voir dire constitutes an inquiry into the possibility that a sitting juror engaged in misconduct. We

recognize that, after empanelment, circumstances may be brought to the judge's attention that would warrant such a check.

If the prosecutor has not declared his or her intent to conduct checks of prospective jurors' CORI records before the jury are sworn and, as discussed below, has not completed such checks before the beginning of the next court day, any inquiry into juror misconduct after the jury are sworn should be conducted only with the approval of the trial judge. After empanelment of the jury, the risks of allowing such an inquiry to be conducted by either party without the trial judge's approval and guidance are too great. A party who fears that the trial is going badly may decide to initiate an inquiry of jurors in the hope of removing enough jurors to force a mistrial.[13] A party, as here, who fears that particular jurors, based on their facial reactions or body language, favor the opposing party may focus its inquiry on these jurors in the hope of discovering some misconduct that will require their removal. Even the suggestion of such an inquiry, should it become known to a juror, may have the effect of influencing that juror not to render a verdict unfavorable to the inquiring party.[14] Because the Commonwealth has access to the database of CORI records, the party conducting such an inquiry will usually be the prosecution, but the defense, although it lacks the authority to conduct a check of CORI records under G. L. c. 6, § 172, may retain an investigator to conduct a comparable inquiry of one or more sitting jurors, and the same reasoning applies to the defense.

To avoid the risks arising from inquiries into the backgrounds of empanelled jurors, we hold that, in all criminal trials commencing after the issuance of the rescript in this case, a

---

[13]We recognized the possibility that the Commonwealth may conduct checks of criminal offender record information for this purpose in Commonwealth v. Cousin, 449 Mass. 809, 819-820 (2007), cert. denied, 553 U.S. 1007 (2008), but deferred in that case to the trial judge's finding that the prosecutor did not conduct the checks at issue with the intent to cause a mistrial.

[14]The Legislature recognized the danger that a prospective juror may feel intimidated or otherwise unfairly influenced by the knowledge that a party was inquiring into the juror's background by enacting G. L. c. 234, § 24A, which provides that, once a juror receives a summons for jury service, "no person shall, except as otherwise provided by law, question any juror so summoned for the purpose of obtaining information as to his background in connection with his jury duty."

prosecutor's independent authority to conduct checks of jurors' CORI records under G. L. c. 6, § 172, to determine if a juror failed to disclose his or her criminal record during voir dire, without the judge's approval, ends once the jury have been sworn. If the prosecutor, cognizant of the time needed to conduct the checks of prospective jurors' CORI records, does not wish to delay the jury from being sworn by waiting for the completion of such checks, or if the judge will not delay the commencement of trial until such checks are completed, the prosecutor may reserve an entitlement to conduct a check of jurors' CORI records by declaring that he or she is content with the jury, subject to the results of such checks, which the prosecutor will cause to be completed immediately, no later than the beginning of the next trial day.[15] By requiring the prosecutor to reserve this entitlement before the jury are sworn, the danger that a record check will be improperly triggered by signs of juror dissatisfaction with the Commonwealth's case will be substantially diminished. After the jury are sworn, unless the prosecutor has reserved an entitlement to conduct such a check, any check of CORI records or other inquiry into juror misconduct, whether sought by the prosecution or the defendant, may be done only with the approval of the trial judge. We add that the same procedure applies to any investigation of jurors that may be conducted by the defense.

4. *Review under G. L. c. 278, § 33E.* We have reviewed the briefs, the transcripts, and the entire record, and see no reason to reduce the degree of guilt or order a new trial.

*Judgments affirmed.*

---

[15]Such a reservation may be made at sidebar rather than in front of the jury.