SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

### State v. Edwin Andujar (A-6-20) (084167)

**Argued March 30, 2021 -- Decided July 13, 2021**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers defendant Edwin Andujar's argument that he was denied the right to a fair trial because racial discrimination infected the jury selection process. In doing so, the Court addresses for the first time when a criminal history check can be run on a prospective juror.

The appeal centers on the selection process for F.G., a Black male from Newark. F.G. was questioned at sidebar for about a half hour. Throughout the questioning, F.G. told the court he believed he could be a fair and impartial juror.

F.G. volunteered that he had answers to multiple voir dire questions, including having two cousins in law enforcement and knowing "[a] host of people" who had been accused of crimes -- five or six close friends in all. In providing details about those accusations, F.G. used terms like "CDS" and "trigger lock." F.G. also told the court about three crime victims he knew. He said that two cousins had been murdered, and a friend had been robbed at gunpoint. F.G. was asked if anything he had said would have an impact on him as a juror. F.G. suggested that he, like every other juror, has a unique background and perspective, which is why defendants are judged by a group. After additional questions, F.G. was asked whether the criminal justice system was fair and effective; F.G. responded, "I believe so because you are judged by your peers."

The State challenged F.G. for cause and asked that he be removed. The prosecutor noted that F.G. "has an awful lot of background" and "uses all of the lingo about, you know, the criminal justice system." A second prosecutor voiced concern that F.G.'s "close friends hustle, engaged in criminal activity" because "[t]hat draws into question whether [F.G.] respects the criminal justice system" and his role as a juror.

Defense counsel stated that "it is not a hidden fact that living in certain areas you are going to have more people who are accused of crimes, more people who are victims of crime," and that "to hold it against [F.G.] that these things have happened . . . to people that he knows . . . would mean that a lot of people from Newark would not be able to serve."

1

The trial court denied the State's motion, explaining that "[e]verything [F.G.] said and the way he said it leaves no doubt in my mind that he . . . does not have any bias towards the State nor the defense . . . .  I think he would make a fair and impartial juror."

After the court's ruling, the prosecution ran a criminal history check on F.G.  The next day, the court explained the prosecutor "came to see me yesterday" and revealed that there were "warrants out for F.G." and that "[t]hey were going to lock him up."  Defense counsel noted there was "one warrant out of Newark Municipal Court."  Afterward, the State renewed its application to remove F.G. for cause.  When the court asked for the defense's position, counsel responded, "I don't oppose[] the State's application."

Defense counsel expressed concern about tainting the jury and added, "I think coming to court for jury service no one expects they are going to be looked up to see if they have warrants."  The prosecutor replied that "the State is not in the habit of . . . looking at a random juror's" criminal history, and then reiterated concerns the State had voiced the day before to explain why it ran a background check.  The prosecutor denied that racial bias played a role in the State's application to remove F.G. for cause.  Defense counsel then placed on the record a "concern that the State doesn't typically check people out, but in this case, they did single someone out to check for warrants."

Defense counsel asked the court to award defendant one additional peremptory challenge.  Counsel argued that the State had an unfair advantage in that it could access databases to run a criminal history check, but defendant could not; counsel also noted that the State's "target[ing]" of F.G. "implicates due process concerns . . . regarding [F.G.'s] rights to sit on a jury."  The court denied the request.  The jury convicted defendant.

The Appellate Division reversed and remanded for a new trial.  462 N.J. Super. 537, 563 (App. Div. 2020).  The Court granted certification.  244 N.J. 170 (2020).

**HELD:**       *Courts, not the parties, oversee the jury selection process.  On occasion, it may be appropriate to conduct a criminal history check to confirm whether a prospective juror is eligible to serve and to ensure a fair trial.  That decision, though, cannot be made unilaterally by the prosecution.  Going forward, any party seeking to run a criminal history check on a prospective juror -- through a government database available only to one side -- must present a reasonable, individualized, good-faith basis for the request and obtain permission from the trial judge.  The results of the check must be shared with both parties and the court, and the juror should be given an opportunity to respond to any legitimate concerns raised.

*That standard was not met here.  Nor is there anything in the record that justified the State's decision to selectively focus on F.G. and investigate only his criminal record.  Based on all of the circumstances, the Court infers that F.G.'s removal from the jury panel may have stemmed from implicit or unconscious bias on the part of the State,

which can violate a defendant's right to a fair trial in the same way that purposeful discrimination can. Defense counsel raised multiple serious concerns but should have leveled a more precise objection. Nonetheless, the Court cannot ignore the evidence of implicit bias that appears in the extensive record. Under the circumstances, defendant's right to be tried by an impartial jury, selected free from discrimination, was violated. The Court therefore reverses his conviction and remands for a new trial.

*New Jersey today allows for the highest number of peremptory challenges in the nation -- more than double the national average -- based on a statute enacted in the late 1800s. Yet, as the United States Supreme Court acknowledged decades ago, peremptory challenges can invite discrimination. See Batson v. Kentucky, 476 U.S. 79, 96, 98 (1986). Although the law remains the same, our understanding of bias and discrimination has evolved considerably since the nineteenth century. And federal and state law have changed substantially in recent decades to try to remove discrimination from the jury selection process. See Batson, 476 U.S. 79; State v. Gilmore, 103 N.J. 508 (1986). It is time to examine the jury selection process -- with the help of experts, interested stakeholders, the legal community, and members of the public -- and consider additional steps needed to prevent discrimination in the way we select juries. The Court calls for a Judicial Conference on Jury Selection. The Conference will convene in the fall to assess this important issue and recommend improvements to our system of justice.

1. Prospective jurors are typically excused in two ways. The court can excuse jurors "for cause" when it appears that they would not be fair and impartial, that their beliefs would substantially interfere with their duties, or that they would not follow the court's instruction or their oath. Either party can challenge a juror for cause; the trial court can also act on its own. Both parties can also exercise peremptory challenges and remove a juror without stating a reason under N.J.S.A. 2B:23-13(b). Both the Federal and State Constitutions bar discrimination based on race in the jury selection process. (pp. 22-23)

2. Under the Equal Protection Clause of the United States Constitution, no citizen can be excluded from jury service on account of race. See Batson, 476 U.S. at 84. In Batson, the Supreme Court outlined an analytical framework to examine whether allegedly discriminatory peremptory challenges violated the Equal Protection Clause. Id. at 93-98. The New Jersey Constitution likewise guarantees defendants a "trial by an impartial jury without discrimination on the basis of religious principles, race, color, ancestry, national origin, or sex." Gilmore, 103 N.J. at 524. That guarantee is rooted in Article I, Paragraphs 5, 9, and 10, which together provide defendants "the right to trial by a jury drawn from a representative cross-section of the community." Id. at 524. (pp. 23-27)

3. In Gilmore, the Court outlined an analytical framework to assess potentially discriminatory peremptory challenges. With certain refinements, the Court summarized the three-step process in State v. Osorio, 199 N.J. 486, 492-93 (2009): (1) the party contesting the peremptory challenge must carry the "slight" burden of "tender[ing]

sufficient proofs to raise an inference of discrimination" in the exercise of the challenge; (2) if that burden is met, then the party exercising the challenge must "prove a race- or ethnicity-neutral basis" for the challenge; and (3) the court must "determine whether, by a preponderance of the evidence, the party contesting the exercise of a peremptory challenge has proven that the contested peremptory challenge was exercised on unconstitutionally impermissible grounds of presumed group bias." The Court reviews guidance from case law applicable to each of the three steps, as well as the remedies available to respond to impermissible uses of peremptory challenges. (pp. 27-31)

4. Batson and Gilmore address purposeful racial discrimination in jury selection. Yet parties may not be aware of their own biases. Justice Marshall highlighted the concern of implicit bias in a concurring opinion in Batson: "A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically." 476 U.S. at 106 (Marshall, J., concurring). From the standpoint of the State Constitution, it makes little sense to condemn one form of racial discrimination yet permit another. What matters is that juries selected to hear and decide cases are chosen free from racial bias -- whether deliberate or unintentional. (pp. 31-33)

5. The practice of running background checks on prospective jurors raises a question of first impression for the Court. Today, the State alone has the ability to unilaterally conduct such checks. The State represents that it is extremely rare for it to conduct background checks on prospective jurors. It relies on regulations promulgated by the Department of Law and Public Safety as the source of its authority. The Court does not question the State's good-faith belief that it had the authority to run the background check it conducted in this case. But administrative regulations generally may not govern the intricacies of jury selection any more than they could control other aspects of a trial. New Jersey case law on the issue is sparse, and other jurisdictions have reached varied conclusions on the subject. (pp. 34-39)

6. In providing guidance on this topic, the Court attempts to accommodate multiple interests: the overriding importance of selecting fair juries that are comprised of qualified, impartial individuals; the need for an evenhanded approach that applies to all parties; the need to guard against background checks prompted by actual or implicit bias; and the importance of having a process that respects the privacy of jurors and does not discourage them from serving. With those aims in mind, the Court relies on its supervisory power to outline a framework for conducting criminal background checks of jurors, detailed in Section IV.C. of the opinion. (pp. 39-42)

7. Here, "[t]he prosecutor presented no characteristic personal to F.G. that caused concern, but instead argued essentially that because he grew up and lived in a neighborhood where he was exposed to criminal behavior, he must have done something wrong himself or must lack respect for the criminal justice system." 462 N.J. Super. at

4

562.  That argument, the Appellate Division observed, was not new, and historically stemmed from impermissible stereotypes about racial groups -- particularly Black Americans.  Ibid.  The trial court properly denied the State's challenge that F.G. be removed for cause.  Ordinarily, the next step would have been for the State to exercise a peremptory challenge that defendant could have challenged under Batson and Gilmore.  Instead, the State ran a criminal history check on F.G. -- a check that did not reveal any history that would disqualify F.G. from jury service.  See N.J.S.A. 2B:20-1.  By unilaterally running a criminal history check on F.G. and setting his arrest in motion, the State effectively evaded any Batson/Gilmore analysis.  (pp. 42-47)

8.  Although no formal Batson/Gilmore evaluation was conducted before the trial court, the detailed record reveals that the circumstances surrounding F.G.'s dismissal allowed for an inference that his removal was based on race -- which, again, is a slight burden to establish.  F.G., a minority juror, answered all questions posed in a manner that led the trial judge to conclude "he would make a fair and impartial juror."  The State's justifications for running the check and seeking F.G.'s removal did not rebut the inference of discrimination.  In fact, the trial court had already considered and discounted the State's reasons when the court denied its motion to remove F.G. for cause.  And throughout the appellate process, the State has not provided a convincing non-discriminatory reason for the steps it took to keep F.G. off the jury.  Finally, the evidence in the record reveals, by a preponderance of the evidence, that F.G.'s removal and the background check that prompted it stemmed from impermissible presumed group bias.  The Court does not find the trial prosecutors engaged in purposeful discrimination or any willful misconduct.  The record here suggests implicit or unconscious bias on the part of the State.  Defendant's constitutional right to be tried by an impartial jury, selected free from discrimination, was violated, and his conviction must be reversed.  (pp. 47-49)

9.  The Court considered implicit bias as part of the Gilmore analysis in this appeal.  Except for defendant, this new rule of law will apply only to future cases.  (p. 49)

10.  New Jersey today provides far more peremptory challenges than any other state, based on a nineteenth-century law.  But "there can be no dispute[] that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'"  Batson, 476 U.S. at 96.  The Court asks the Director of the Administrative Office of the Courts to arrange for a Judicial Conference on Jury Selection to explore the nature of discrimination in the jury selection process.  The Court invites the legal community as a whole to take part in a probing conversation about additional steps needed to root out discrimination in the selection of juries.  (pp. 50-54)

**AFFIRMED AS MODIFIED and REMANDED for a new trial.**

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.**

5

# SUPREME COURT OF NEW JERSEY

## A-6 September Term 2020

### 084167

State of New Jersey,

Plaintiff-Appellant,

v.

Edwin Andujar,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
462 N.J. Super. 537 (App. Div. 2020).

| Argued | Decided |
|--------|---------|
| March 30, 2021 | July 13, 2021 |

Frank J. Ducoat, Special Deputy Attorney General/Acting
Assistant Prosecutor, argued the cause for appellant
(Theodore N. Stephens, II, Acting Essex County
Prosecutor, attorney; Frank J. Ducoat and Emily M.M.
Pirro, Special Deputy Attorney General/Acting Assistant
Prosecutor, of counsel and on the briefs).

Joseph J. Russo, Deputy Public Defender, argued the
cause for respondent (Joseph E. Krakora, Public
Defender; attorney; Joseph J. Russo, Alison Perrone,
First Assistant Deputy Public Defender, Kevin S.
Finckenauer, Assistant Deputy Public Defender, of
counsel and on the briefs, and John Douard, Assistant
Deputy Public Defender, on the briefs).

Adam D. Klein, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Adam D. Klein, of counsel and on the brief).

Karen Thompson argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Karen Thompson, Alexander Shalom, and Jeanne LoCicero, on the brief).

Raymond M. Brown argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, of counsel and on the brief).

Jonathan Romberg argued the cause for amicus curiae Seton Hall University School of Law Center for Social Justice (Seton Hall University School of Law Center for Social Justice, attorneys; Jonathan Romberg, on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

In this appeal, defendant argues he was denied the right to a fair trial because racial discrimination infected the jury selection process. The Appellate Division reversed defendant's conviction on that ground, and we modify and affirm the court's judgment. In doing so, we address for the first time when a criminal history check can be run on a prospective juror.

The appeal centers on the selection process for F.G., a Black male from Newark who was summoned for jury service. The prosecution questioned F.G.

extensively about people he knew who had been accused of crimes, or were victims of crimes, and then asked the trial judge to remove him for cause. The State argued that F.G.'s background, associations, and knowledge of the criminal justice system were problematic, and also suggested that F.G. had been evasive. The trial judge rejected the challenge and found F.G. "would make a fair and impartial juror."

Relying on the same reasons the trial judge did not accept, the State chose to run a criminal history check on F.G. It did not investigate any other prospective jurors in that way.

The prosecution promptly notified the trial judge and defense counsel of what the background check revealed: F.G. had two prior arrests that did not result in a conviction and an outstanding municipal court warrant for simple assault. Nothing in the results disqualified F.G. from serving as a juror.

By the time court resumed the next day, however, the prosecution had already taken steps to arrange for F.G.'s arrest. After further discussion in court, he was removed from the jury panel and arrested. The outstanding charges against him were dropped two months later.

Courts, not the parties, oversee the jury selection process. On occasion, it may be appropriate to conduct a criminal history check to confirm whether a prospective juror is eligible to serve and to ensure a fair trial. That decision,

though, cannot be made unilaterally by the prosecution.  Going forward, we direct that any party seeking to run a criminal history check on a prospective juror must present a reasonable, individualized, good-faith basis for the request and obtain permission from the trial judge.  We refer to a check of a government database that is available to only one side.  The results of the check must be shared with both parties and the court, and the juror should be given an opportunity to respond to any legitimate concerns raised.

That standard was not met here.  Nor is there anything in the record that justified the State's decision to selectively focus on F.G. and investigate only his criminal record.  Based on all of the circumstances, we infer that F.G.'s removal from the jury panel may have stemmed from implicit or unconscious bias on the part of the State, which can violate a defendant's right to a fair trial in the same way that purposeful discrimination can.

We require defense counsel to make precise, timely objections during jury selection.  Here, counsel raised multiple serious concerns but should have leveled a more precise objection.  Nonetheless, we cannot ignore the evidence of implicit bias that appears in the extensive record.  Under the circumstances, we find that defendant's right to be tried by an impartial jury, selected free from discrimination, was violated.  We therefore reverse his conviction and remand for a new trial.

This appeal highlights the critical role jury selection plays in the administration of justice. It also underscores how important it is to ensure that discrimination not be allowed to seep into the way we select juries. Potential jurors can be removed for cause if it appears they cannot serve fairly and impartially. The parties can also strike individual jurors, without giving a reason, by exercising peremptory challenges. N.J.S.A. 2B:23-13(b).

New Jersey today allows for the highest number of peremptory challenges in the nation -- more than double the national average -- based on a statute enacted in the late 1800s. Yet, as the United States Supreme Court acknowledged decades ago, peremptory challenges can invite discrimination. See Batson v. Kentucky, 476 U.S. 79, 96, 98 (1986).

Although the law remains the same, our understanding of bias and discrimination has evolved considerably since the nineteenth century. And federal and state law have changed substantially in recent decades to try to remove discrimination from the jury selection process. See Batson, 476 U.S. 79; State v. Gilmore, 103 N.J. 508 (1986).

It is time to examine the jury selection process -- with the help of experts, interested stakeholders, the legal community, and members of the public -- and consider additional steps needed to prevent discrimination in the way we select juries. We therefore call for a Judicial Conference on Jury

5

Selection. The Conference will convene in the fall to assess this important issue and recommend improvements to our system of justice.

## I.

## A.

Defendant Edwin Andujar was accused of killing his roommate in August 2014 by stabbing him twelve times with a knife. At trial, a neighbor from the apartment downstairs testified that she heard a noise, ran upstairs, and saw defendant holding a bloody knife next to the victim. The victim was in a wheelchair at the time. The neighbor heard the victim exclaim that defendant had stabbed him and was killing him. She then ran downstairs and called 9-1-1. When a police officer arrived, defendant reportedly said, "I stabbed him, I couldn't take it anymore."

Defendant testified that his roommate had told him he had to move out of the apartment and then came at him with a knife. Defendant claimed he took the knife during a struggle and then swiped at the victim and stabbed him in an effort to get the victim off of him. Defendant said he never meant to hurt the victim, who was a friend.

Five days later, after several surgeries, the victim died from his wounds. In June 2017, a jury convicted defendant of first-degree murder and two

6

weapons offenses. He was sentenced to forty-five years in prison with a period of parole ineligibility of approximately thirty-eight years.

B.

According to the State, jury selection in this case lasted eight days; the record contains only two days of transcripts. On May 31, 2017, F.G., a prospective juror, was questioned at sidebar for about a half hour. More than thirty pages of the transcript from that day relate to him. Throughout the questioning, F.G. told the court he believed he could be a fair and impartial juror.

F.G. volunteered that he had answers to multiple voir dire questions, which the court carefully reviewed one by one. F.G. first relayed that he had two cousins in law enforcement -- "a Newark cop and . . . an Irvington cop." He said that he did not discuss their work with them and that those relationships would not interfere with his ability to serve on the jury.

F.G. next responded to this question: "Have you, any family member, or close friend ever been accused of committing an offense other than a minor motor vehicle offense?" He reported that he knew "[a] host of people" who had been accused of crimes -- five or six close friends in all.

One had been accused of selling what F.G. referred to as "CDS" -- a controlled dangerous substance -- five or six months before in Newark. F.G.

7

did not know the details of the case aside from the outcome: "[T]hey get locked up after that it ain't got nothing to do with it." F.G. had gone to high school with the person and believed he had been treated fairly. F.G. did not know whether the individual was still in jail because F.G. had "moved away."

A second friend had also been charged with selling drugs in Newark the prior summer. F.G. assumed the result was the same as the first matter. He explained he had no impression whether the second person had been treated fairly, noting, "[h]onestly, I don't have any problem as long as I stay out of it."

F.G. believed the third person sold a "CDS" together with the second individual and assumed both had been treated fairly. He did not know the details of the cases and told the court, "I don't get into their case. I don't get into their business."

A fourth friend had been charged with gun possession about seven years before in Newark. F.G. assumed he had been found guilty "[b]ecause he went away for some years." F.G. added, "I don't know if he pleaded guilty. All I know he got trigger locked and he went away."[1] F.G. saw the person when he

---

[1] Since the 1990s, federal prosecutors and agencies have partnered with state and local law enforcement to investigate and prosecute firearms offenses as part of a gun violence reduction strategy. Among other names, the program has been known as "Project Triggerlock" and "Operation Triggerlock." See U.S. Dep't of Just., Summary of District Gun Violence Reduction Strategies, https://www.justice.gov/archive/opd/AppendixA.htm (last visited July 7, 2021).

came home again but did not speak with him about the offense or how he thought he had been treated.  In response to a follow-up question, F.G. said, "I know he had three gun charges.  I know after the third one he went to the feds."  When asked about his familiarity with the term "trigger lock," F.G. explained, "I'm familiar with it.  I grew up in a neighborhood where it just ain't good.  You learn a lot of things from the streets."

F.G. did not recall "[a]nybody else charged."  He then told the court about three crime victims he knew.  He said that two cousins had been murdered.  One was stabbed to death in Newark about fifteen years earlier.  The person accused of the crime was acquitted at trial.  F.G. said he was upset by the verdict but did not have any resentment toward the criminal justice system.  He added that he stayed away and wanted no part of the matter.

Another cousin had been shot to death a year or two afterward in Kentucky.  The accused in that case went to trial and was convicted.  Both matters involved domestic disputes.

The third victim, a friend of F.G.'s, had been robbed at gunpoint in Newark two years ago.  No one was charged in the case.  When asked what he thought about that, F.G. responded, "[a] lot of my friends live that lifestyle, so I think it just come with the territory."

9

The court then asked F.G. if "the fact that you know a lot of people who are accused of crimes and lot of people who are victim[s] of crimes . . . would make you a better juror than someone who hasn't had that kind of experience in their life." F.G. responded, "No." When asked if anything he had said so far would have an impact on him as a juror and on the way he would view the evidence, F.G. said, "the same as anybody else, background would affect them." In response to a question, he later clarified his answer:

> What I was saying was, like, everybody in here, jurors and everybody, got a background. And, you know, this is different, that is why you getting judged by what 14, 13, and everybody got different perspectives about everything.
>
> So, you know, what I'm saying, mine's might be a little different than the next person. The next person's might be little different according to where they grew up and how they grew up.

F.G. also clarified his comment about the "lifestyle" his friends lived: "A lot of my -- a lot of friends I grew up in neighborhood, they hustle, they selling drugs; that is what I meant by the lifestyle."

In response to the balance of the jury questionnaire, F.G. explained that he worked for the Department of Public Works in East Orange. Previously, he had been a security guard at high schools in Newark for about ten years and a postal worker. F.G. added that he attended but did not finish college, and he coached football in Newark in his spare time.

10

For the final question -- whether the criminal justice system was fair and effective -- F.G. responded, "I believe so because you are judged by your peers."

## C.

After the above exchange, the State challenged F.G. for cause and asked that he be removed. The prosecutor offered the following justification:

> He has an awful lot of background. He says that he wants no parts of any of this, but he has a host, using his own language, of friends and family that have been accused of crimes, same as being victims.
>
> But when asked to give a number, he just kind of guessed at the number, Judge, he gave us a number that would satisfy us, the State submits. And I just felt that there is more people that he knows are accused and even more that could be victims. I think on a case like this he has had two cousins that were murdered, one was involved in a stabbing and a domestic dispute. It sort of mirrors the facts of this case. It is a risk to take a chance on somebody that might have a, you know, problem with his cousin getting murdered in a domestic dispute when we have the same set of facts in this case almost mirroring it.
>
> You know, he has -- he uses all of the lingo about, you know, the criminal justice system, talked about people getting picked up, talked about people getting trigger locked, talked about CDS, talks about the lifestyle. I just think that given his background and his extensive background in the criminal justice system with friends and family and knowing what the testimony in this case is going to be is problematic. And I think the juror should be excused for cause based on his answers to those questions.

11

A second prosecutor then added,

> What I think is very concerning his close friends hustle, engaged in criminal activity. That is how his friends make a living. That draws into question whether he respects the criminal justice system, whether he respects what his role is here, and whether he is going to uphold all of the principles that he was instructed by your Honor.
>
> Additionally, I don't think that he was as forthcoming about his knowledge of the system. I know towards the end after probing by counsel and by your Honor, he did admit he knew a term such as "trigger locking" and the way things worked. But in the beginning he seemed to just be not forthcoming, no, I don't really know, I know they are locked up, I don't hear anything. I don't think he was being fully honest.

In response, defense counsel called "the State's position . . . untenable in the sense that it means that no black man in Newark would be able to sit on this jury." When challenged by the prosecution, defense counsel took back her comment about race and continued,

> The people that he is around, because of where he lives, the socioeconomic status of those people, their interactions with the criminal justice system, it is not a hidden fact that living in certain areas you are going to have more people who are accused of crimes, more people who are victims of crime. I think he was very patient with us and went through the people that he could remember.
>
> The fact that he said things like you get picked up, uhmm, that is just a fact of his life. He was the one who volunteered the word or the term "trigger locked."

12

He explained that he knew that term. It is not that he is part of this milieu if we will use that term.

And he also mentioned that, a lot of my friends live that lifestyle. But he also, you know, when he was explaining that, he says that he likes to stay out of it, he doesn't like to involve himself in that. So I think to hold it against him that these things have happened around him to happen to people that he knows is not a position that I think your Honor should entertain, because I think it would mean that a lot of people from Newark would not be able to serve.

The trial court then rejected the State's motion and explained,

I don't think there has been any reason at all that this juror should be excused for cause.

Everything he said and the way he said it leaves no doubt in my mind that he's not expressed or does not have any bias towards the State nor the defense for anything. What he said, how he said it. I think he would make a fair and impartial juror. I don't have any reason to doubt it, so that application is denied.

D.

After the court's ruling, the prosecution ran a criminal history check on F.G. On the next day of jury selection, June 1, 2017, the court explained the prosecutor "came to see me yesterday afternoon" and revealed that F.G. "had been arrested before. He had warrants out for him. They were going to lock him up." The court noted the State provided incident reports and some printouts as corroboration. The judge also stated that he had directed the prosecutor "to tell [defense counsel] the same thing."

13

Defense counsel corrected the record and noted there was "one warrant out of Newark Municipal Court." Afterward, the State renewed its application to remove F.G. for cause. When the court asked for the defense's position, counsel responded, "I don't oppose[] the State's application."

Much of the discussion that immediately followed focused on how to avoid having F.G.'s arrest taint the jury pool. The prosecution represented that F.G. would not be arrested in the jury's presence. The prosecutor revealed the following as well: that she had disclosed the information to a sergeant to "contact[] Newark fugitive"; and that she "made a call this morning to find out if, in fact, he was apprehended to avoid him having to come here." In other words, before the discussion in court on June 1, the prosecution had taken steps to have the prospective juror arrested on a municipal court warrant.

To avoid any taint, the court suggested it would bring all the jurors into the courtroom and excuse F.G. Once he returned to the first floor of the courthouse, law enforcement would take over.

The following exchange occurred during that discussion. Defense counsel expressed concern about tainting the jury and added, "I think coming to court for jury service no one expects they are going to be looked up to see if they have warrants."

14

The prosecutor replied, "just so the record is clear, the State is not in the habit of doing what counsel just suggested where we are looking at a random juror's" criminal history. The prosecutor then reiterated concerns the State had voiced the day before to explain why it ran a background check: F.G.'s "background and his acknowledgment that he hangs out with people that are in a lifestyle and hustling drugs and getting arrested, the dozens of criminal elements that he produced here at sidebar raised the concern for the State."

The prosecutor again denied that racial bias played a role in the State's application to remove F.G. for cause. After the request had been denied the day before, the prosecutor stated, "[w]e did do a look up on him. He turned up to have an open warrant . . . plus additional arrests in the past, both for domestic violence where it seems he has an alleged habit of beating up women."[2]

Defense counsel then placed on the record a

> concern that the State doesn't typically check people out, but in this case, they did single someone out to check for warrants. I think that is a concern, and I don't know what the remedy is for that. But it is troubling that this person, this potential juror was singled out.

After a short recess, during which defense counsel consulted her office, she asked the court to award defendant one additional peremptory challenge.

---

[2] The record on appeal contains no support for this statement.

Counsel argued the State had an unfair advantage in that it could access databases to run a criminal history check, but defendant could not. According to defendant, "[t]he State clearly would have used a peremptory strike for this potential juror" for the reasons they expressed at sidebar; instead, they "used their resources" and did not have to "use a peremptory strike." An additional peremptory challenge, counsel argued, would partly "fix that imbalance." It would not, however, "address the concern that the State is record checking people that they don't like." In response to a question from the court, defense counsel confirmed that the only remedy she sought was an additional peremptory challenge.

The prosecution opposed the request, and the court reserved decision on the issue. The judge then brought the jury panel into the courtroom and excused F.G., as planned.

The court later heard additional argument from the parties. Defense counsel again noted the unfairness of allowing one side to conduct background checks when the other could not, and added that the State "selectively target[ed] one potential juror and look[ed] up information about that potential juror. They didn't have to do that. They chose to do that. They targeted that juror. I think it implicates due process concerns. It implicates constitutional

concerns regarding that person's rights to sit on a jury." Counsel submitted that F.G. had no criminal convictions and could sit on a jury.

In addition, counsel argued that there was no evidence that F.G. knew about the prior charges, so it did not appear that he was dishonest by not revealing them to the court. To the contrary, counsel argued, F.G. continued to show up for jury duty, which suggested he did not know about the outstanding bench warrant.

The State argued that F.G. had an open warrant for his arrest, had been processed, and was no longer available to serve as a juror. The State also observed that defense counsel had consented to the renewed challenge for cause.

Defense counsel disagreed. "I believe I deferred to the court with the understanding that he was going to be arrested. . . . I did put my opposition to the fact that he was going to be arrested. I still don't think that that is the correct way to have dealt with this." The court then reviewed counsel's earlier response and noted she had not objected.

Later the same day, the court denied defendant's application for an additional peremptory challenge. The court again observed "that defense [counsel] did not object to [F.G.] being excused for cause." Nor did defendant present "any controlling authority" that "dictate[d] the defense should receive

an extra challenge." At the end of the process, the State had one peremptory challenge left and defendant had two. As noted earlier, after the jury considered the evidence, it convicted defendant.

## E.

Defendant appealed. The Appellate Division reversed his conviction and remanded the matter for a new trial. State v. Andujar, 462 N.J. Super. 537, 563 (App. Div. 2020).

The court initially confirmed that defendant had properly preserved a challenge to the composition of the jury. Id. at 549-51. The Appellate Division did "not reach the question whether a criminal record check is authorized during jury voir dire" but recommended that a more complete record be made in such an instance. Id. at 555. The court added that "the State should not have undertaken . . . measures that . . . render[ed] a seated juror unavailable without leave of court." Ibid.

The Appellate Division noted that an analysis should have been done under the Batson/Gilmore framework, which we discuss later, and that defendant could have presented a prima facie case of discrimination relating to the State's treatment of F.G. -- a member of a protected group who alone "was subjected to a record check." Id. at 561-62.

18

Based on the record, the Appellate Division could not "determine with certainty whether the prosecutor applied her reasons" for challenging F.G. "evenhandedly to all prospective jurors." Id. at 562. Nonetheless, "relief [was] available to rectify the matter," and the Appellate Division found the trial court "could have refused to grant a dismissal for cause even in the face of the juror's potential arrest . . . on a municipal warrant." Id. at 563.

Because the trial "court made no findings of fact concerning the prosecution's selective use of a criminal record check and granted no relief to the defense," the Appellate Division reversed defendant's conviction and remanded the case for a new trial. Ibid.

We granted the State's petition for certification. 244 N.J. 170 (2020). We also granted leave to the Attorney General, the American Civil Liberties Union of New Jersey (ACLU), the Association of Criminal Defense Lawyers of New Jersey (ACDL), and the Seton Hall University School of Law Center for Social Justice (CSJ) to participate as friends of the Court.

II.

The State contends that prosecutors may conduct criminal history checks of prospective jurors based on N.J.A.C. 13:59-2.1(a). The State also asserts that it moved to strike F.G. for cause based on race-neutral reasons, including information learned during the background check it ran. Defendant cannot

19

establish a prima facie case of discrimination under the circumstances, according to the State. And if he could, the State maintains, it is essential to hold a hearing pursuant to Batson/Gilmore. The State therefore submits that defendant's conviction should be reinstated or, in the alternative, that the matter should be remanded to the trial court for a hearing.

The Attorney General focuses in particular on criminal history checks. The Attorney General maintains that prosecutors should be able to access a juror's criminal history if they reasonably believe it may cast doubt on the person's ability to serve impartially; if challenged, "prosecutors . . . must be able to articulate a legitimate, good-faith belief why" the record check was appropriate. The Attorney General also proposes that best practices be adopted for the rare occasions when records checks are conducted.

Defendant counters that prosecutors do not, and should not, have the authority to perform independent criminal background checks on jurors. Such investigations, defendant asserts, will discourage jury service and likely have a disproportionate effect on Black Americans. Defendant argues that the State's actions amounted to a colorable claim of discrimination for which the only viable remedy at this time is the reversal of his conviction. Defendant also submits that the Batson/Gilmore framework should be modified to include an

20

"objective observer" standard in order to address the test's shortcomings.  See

State v. Jefferson, 429 P.3d 467, 480 (Wash. 2018).

The ACLU contends that the State's selective use of a criminal

background check denied defendant his constitutional right to equal protection

of the law and to a trial by a jury comprised of a fair cross-section of the

community.  The organization also asks the Court to impose new rules to

protect jurors from unwarranted criminal history checks.

The ACDL maintains that this case shows how prosecutors can evade

review under Batson/Gilmore and why reforms are needed to the jury selection

process.  The group points to potential changes to combat implicit bias and

urges the Court to exercise its supervisory powers to prevent the State from

conducting background checks on jurors.

The CSJ contends that discriminatory background checks on prospective

jurors violate the State Constitution; that the State violated Gilmore because

the case's underlying principles extend to background checks; that implicit

bias is a form of racially disparate treatment; and that the Court should adopt

new rules to protect against bias in jury selection.

### III.

Because of the manner in which jury selection unfolded in this case,

defendant and amici contend that F.G.'s removal inappropriately evaded

21

review under <u>Batson</u> and <u>Gilmore</u>. Those cases involve peremptory challenges.

Prospective jurors who are otherwise qualified to serve are typically excused in two ways. The court can excuse jurors "for cause" when it appears that they would not be fair and impartial, that their beliefs would substantially interfere with their duties, or that they would not follow the court's instruction or their oath. <u>State v. Simon</u>, 161 N.J. 416, 465 (1999); <u>State v. DiFrisco</u>, 137 N.J. 434, 460 (1994). Either party can challenge a juror for cause; the trial court can also act on its own. Both parties can also exercise peremptory challenges and remove a juror without stating a reason under N.J.S.A. 2B:23-13(b).

To provide relevant context, we start with an overview of the case law and principles relating to jury service and the selection process.

## A.

Among the most important responsibilities we have as citizens is the obligation to serve on a jury. Jury service provides a "substantial opportunity . . . to participate in the democratic process." <u>Flowers v. Mississippi</u>, 588 U.S. ___, 139 S. Ct. 2228, 2238 (2019). It also "guards the rights of the parties" and fosters respect for the law. <u>Powers v. Ohio</u>, 499 U.S. 400, 407 (1991). Bringing together a diverse group of jurors with different life experiences and

22

insights not only preserves "the right to trial by a jury drawn from a representative cross-section of the community" but also helps achieve impartiality. Gilmore, 103 N.J. at 524-25.

Both the Federal and State Constitutions bar discrimination based on race in the jury selection process. The challenge is how to implement that mandate effectively.

1.

Under the Equal Protection Clause, no citizen can "be excluded from jury service on account of . . . race." Powers, 499 U.S. at 407; see Batson, 476 U.S. at 84; U.S. Const. amend. XIV, § 1. The Clause "forbids" prosecutors from challenging potential jurors based solely on their race. Batson, 476 U.S. at 89. Although jurors do "not have a right to sit on any particular . . . jury," they do "possess the right not to be excluded from one on account of race." Powers, 499 U.S. at 409. And a defendant is denied "equal protection of the laws when . . . [placed] on trial before a jury from which members of his race have been purposefully excluded" on the basis of race. Batson, 476 U.S. at 85 (citing Strauder v. West Virginia, 100 U.S. 303 (1880)).

Those principles have evolved over time. Strauder set forth basic concepts against discrimination more than a century ago when the Supreme Court struck down a state law that allowed only "white male persons" to serve

23

on juries. 100 U.S. at 305, 310. Yet discrimination in jury selection continued long after in a "more covert" way -- "often accomplished through peremptory challenges in individual courtrooms rather than by blanket operation of law." Flowers, 588 U.S. at ___, 139 S. Ct. at 2240.

In Swain v. Alabama, decided eighty-five years after Strauder, the Supreme Court observed that "purposeful discrimination [could] not be assumed" and imposed a high burden on defendants to establish a constitutional violation. 380 U.S. 202, 205 (1965). The Court, in particular, "held that a defendant could not object to the State's use of peremptory strikes in an individual case," Flowers, 588 U.S. at ___, 139 S. Ct. at 2240, and that prosecutors were not required to explain their reasons for challenging jurors in a given case, Swain, 380 U.S. at 222.

Two decades later, the Court's decision in Batson overruled parts of Swain. Batson, 476 U.S. at 92-93; see also Flowers, 588 U.S. at ___, 139 S. Ct. at 2240. Batson recognized that "prosecutors' peremptory challenges [were then] largely immune from constitutional scrutiny" because "the teaching of Swain" had led trial courts to place "a crippling burden of proof" on defendants. 476 U.S. 92-93. The Court went on to outline an analytical framework to examine whether allegedly discriminatory peremptory challenges violated the Equal Protection Clause.

24

Under <u>Batson</u>, defendants must first establish "a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." <u>Id.</u> at 93-94. The burden then "shifts to the State to come forward with a neutral explanation for" the peremptory challenge. <u>Id.</u> at 97. Next, the trial judge decides whether "the defendant has established purposeful discrimination." <u>Id.</u> at 98. In doing so, the court "must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." <u>Flowers</u>, 588 U.S. at ___, 139 S. Ct. at 2241.

The Supreme Court reaffirmed the above standard in <u>Powers</u> and <u>Flowers</u>. <u>Powers</u> explained that it is not necessary for the defendant and the excluded juror to be of the same race in order to assert a <u>Batson</u> challenge, 499 U.S. at 406, and that a defendant has standing to raise equal protection claims on behalf of jurors who are excluded because of their race, <u>id.</u> at 415.

<u>Flowers</u> noted, among other things, "that disparate questioning can be probative of discriminatory intent." 588 U.S. at ___, 139 S. Ct. at 2247. As the Court observed,

> [d]isparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race. In other words, by asking a lot of questions of the black prospective jurors or

25

conducting additional inquiry into their backgrounds, a prosecutor can try to find some pretextual reason -- any reason -- that the prosecutor can later articulate to justify what is in reality a racially motivated strike.

[Id. at 2247-48 (citation omitted).]

The Court added that "disparate questioning or investigation alone does not constitute a Batson violation," but it can, "along with other evidence, inform the trial court's evaluation of whether discrimination occurred." Id. at 2248.

Flowers also underscored certain basic principles. The Supreme Court observed that "even a single instance of race discrimination against a prospective juror is impermissible" under the Equal Protection Clause. Id. at 2242. And the Court reaffirmed that "[e]qual justice under law requires a criminal trial free of racial discrimination in the jury selection process." Ibid.

2.

The New Jersey Constitution likewise guarantees defendants a "trial by an impartial jury without discrimination on the basis of religious principles, race, color, ancestry, national origin, or sex." Gilmore, 103 N.J. at 524. That guarantee is rooted in Article I, Paragraphs 5, 9, and 10 of the State Constitution, which provide as follows: "No person shall be denied the enjoyment of any civil . . . right, nor be discriminated against in the exercise of any civil . . . right, . . . because of religious principles, race, color, ancestry or

26

national origin," N.J. Const. art. I, ¶ 5; "The right of trial by jury shall remain inviolate," N.J. Const. art. I, ¶ 9; and "In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury," N.J. Const. art. I, ¶ 10; Gilmore, 103 N.J. at 524.

Those guarantees together provide defendants "the right to trial by a jury drawn from a representative cross-section of the community." Gilmore, 103 N.J. at 524. That principle is meant to promote impartiality, by having jurors with "diverse beliefs and values" interact, and to enhance public respect for the court process. Id. at 525 (quoting People v. Wheeler, 583 P.2d 748, 761 (Cal. 1978)).

Two months after Batson was decided, this Court in Gilmore outlined a similar analytical framework to assess potentially discriminatory peremptory challenges. The Court anchored its decision to the State Constitution, which it noted provides greater protection for individual rights than the Federal Constitution. Id. at 522-23.

With certain refinements, the Court later summarized the three-step process in State v. Osorio:

> Step one requires that, as a threshold matter, the party contesting the exercise of a peremptory challenge must make a prima facie showing that the peremptory challenge was exercised on the basis of race or ethnicity. That burden is slight, as the challenger need only tender sufficient proofs to raise an inference of

discrimination. If that burden is met, step two is triggered, and the burden then shifts to the party exercising the peremptory challenge to prove a race- or ethnicity-neutral basis supporting the peremptory challenge. In gauging whether the party exercising the peremptory challenge has acted constitutionally, the trial court must ascertain whether that party has presented a reasoned, neutral basis for the challenge or if the explanations tendered are pretext. Once that analysis is completed, the third step is triggered, requiring that the trial court weigh the proofs adduced in step one against those presented in step two and determine whether, by a preponderance of the evidence, the party contesting the exercise of a peremptory challenge has proven that the contested peremptory challenge was exercised on unconstitutionally impermissible grounds of presumed group bias.

[199 N.J. 486, 492-93 (2009).]

The updated standard modified <u>Gilmore</u>'s first step. Rather than presume the constitutionality of a peremptory challenge and require a defendant to show there was "a substantial likelihood" the challenge was based on group bias, <u>see</u> <u>Gilmore</u>, 103 N.J. at 535-36, <u>Osorio</u> made clear that challengers need only present "sufficient proofs to raise an inference of discrimination," 199 N.J. at 492. <u>Osorio</u> imported that change from <u>Johnson v. California</u>, 545 U.S. 162, 170-72 (2005) ("[A] defendant satisfies the requirements of <u>Batson</u>'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."). The revised standard is "far less exacting." <u>Osorio</u>, 199 N.J. at 502.

28

Gilmore identified a number of factors courts can consider to assess whether a defendant has made a prima facie showing:

> (1) [whether] the prosecutor struck most or all of the members of the identified group from the venire; (2) [whether] the prosecutor used a disproportionate number of his or her peremptories against the group; (3) [whether] the prosecutor failed to ask or propose questions to the challenged jurors; (4) [whether] other than their race, the challenged jurors are as heterogenous as the community as a whole; and (5) [whether] the challenged jurors, unlike the victims, are the same race as defendant.
>
> [See Osorio, 199 N.J. at 503-04 (quoting State v. Watkins, 114 N.J. 259, 266 (1989)).]

The factors, of course, apply to challenges by either side. See Georgia v. McCollum, 505 U.S. 42, 59 (1992); State v. Andrews, 216 N.J. 271, 273 (2013). No party in a criminal or civil case can use peremptory challenges to remove a juror on the basis of race or gender. Edmonson v. Leesville Concrete Co., 500 U.S. 614, 616 (1991); J.E.B. v. Ala. ex rel. T.B., 511 U.S. 127, 130-31 (1994); Andrews, 216 N.J. at 273.

To carry its burden on step two, a party "must articulate clear and reasonably specific explanations of its legitimate reasons for exercising each of the peremptory challenges." Osorio, 199 N.J. at 504 (quoting Gilmore, 103 N.J. at 537). Trial judges must be mindful that unexplained "hunches" and "gut reactions" "may be colloquial euphemisms for the very prejudice that

29

constitutes impermissible presumed group bias or invidious discrimination."

Gilmore, 103 N.J. at 539.

For the final step, the trial court must balance "whether the proffered explanations are 'genuine and reasonable grounds'" to remove biased jurors or simply "sham excuses." Osorio, 199 N.J. at 504-05 (quoting Gilmore, 103 N.J. at 537-38).[3]

Trial judges can select from a number of remedies to respond to "impermissible uses of peremptory challenges," such as

> dismissing the empaneled jury member(s) and the venire and beginning jury selection anew; reseating the wrongfully excused juror(s); reseating the wrongfully excused juror(s) and ordering forfeiture by the offending party of his or her improperly exercised peremptory challenge(s); permitting trial courts to require challenges to prospective jurors outside the presence of the jury; granting additional peremptory challenges to the aggrieved party, particularly when wrongfully dismissed jurors are no longer available; or a combination of these remedies as the individual case requires.
>
> [Andrews, 216 N.J. at 293.]

---

[3] Defendant asks the Court to replace the subjective inquiry in Batson's final step with a "objective observer" test. See Jefferson, 429 P.3d at 470 (holding the trial court must ask, for Batson's third step, "whether an objective observer could view race or ethnicity as a factor in the use of the peremptory strike"). We refer that question to the Judicial Conference on Jury Selection discussed in Section VII.

The remedy chosen "must assure a fair trial to all and eliminat[e] . . . the taint of discrimination." Ibid.

B.

Batson and Gilmore address purposeful racial discrimination in jury selection. 476 U.S. at 93-94; 103 N.J. at 537. Yet parties may not be aware of their own biases.

Although individuals may not be willing to admit they harbor racial bias, "[e]xplicit . . . bias is consciously held." State v. Berhe, 444 P.3d 1172, 1181 (Wash. 2019). Implicit or unconscious bias is different. "Implicit bias refers to . . . attitudes or stereotypes that affect our understanding, actions, and decisions in an unconscious manner." Cheryl Staats et al., Kirwan Inst. for the Study of Race and Ethnicity, Implicit Bias app. at 62 (2015), http://kirwaninstitute.osu.edu/wp-content/uploads/2015/05/2015-kirwan-implicit-bias.pdf. Such biases "encompass both favorable and unfavorable assessments, [and] are activated involuntarily and without an individual's awareness or intentional control." Ibid. In other words, a lawyer or self-represented party might remove a juror based on an unconscious racial stereotype yet think their intentions are proper.

Justice Marshall highlighted this concern in a concurring opinion in Batson: "A prosecutor's own conscious or unconscious racism may lead him

31

easily to the conclusion that a prospective black <u>juror</u> is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically." 476 U.S. at 106 (Marshall, J., concurring). In this appeal, counsel likewise cite articles about the danger of implicit bias in jury selection.

It is important for the New Jersey Judiciary to focus with care on issues related to implicit bias. They include an array of legal questions worthy of attention, and we outline a process to address them in Section VII. For now, we simply recognize that implicit bias is no less real and no less problematic than intentional bias. The effects of both can be the same: a jury selection process that is tainted by discrimination.

From the standpoint of the State Constitution, it makes little sense to condemn one form of racial discrimination yet permit another. What matters is that juries selected to hear and decide cases are chosen free from racial bias -- whether deliberate or unintentional. <u>Gilmore</u>'s reasoning, therefore, logically extends to efforts to remove jurors on account of race either when a party acts purposely or as a result of implicit bias. In both instances, a peremptory challenge can violate the State Constitution, depending on the circumstances.

As in <u>Gilmore</u>, our conclusion rests on the State Constitution, which in some settings affords greater protection for individual rights than the Federal

Constitution. 103 N.J. at 522-23; <u>cf.</u> <u>Jefferson</u>, 429 P.3d at 470; <u>see also</u> <u>State v. Saintcalle</u>, 309 P.3d 326, 335-37 (Wash. 2013).

C.

The courts, not the parties, oversee jury selection. <u>See</u> <u>Pellicer v. Saint Barnabas Hosp.</u>, 200 N.J. 22, 40 (2009) ("The chief responsibility for conducting jury selection rests with the trial judge." (quoting <u>State v. Wagner</u>, 180 N.J. Super. 564, 567 (App. Div. 1981))).

Various statutes address the court's administration of the jury selection process. <u>See, e.g.</u>, N.J.S.A. 2B:20-3 to -9, -11, -13, -15 (noting the Assignment Judge's role relating to questionnaires, selection, certification, summoning, excuses, and discharge of jurors); N.J.S.A. 2B:23-2, -3, -10, -14 (setting forth the court's role relating to the selection, empanelment, examination, and challenging of petit jurors); <u>see also</u> <u>In re Supervision & Assignment of Petit Jury Panels</u>, 60 N.J. 554, 559-62 (1972). In addition, <u>Rule</u> 1:8-3(a) directs judges to question prospective jurors. In the court's discretion, the parties may supplement the court's questions. <u>R.</u> 1:8-3(a).

Of particular note here, "the job of enforcing <u>Batson</u> rests first and foremost with trial judges." <u>Flowers</u>, 588 U.S. at ___, 139 S. Ct. at 2243. They have "the primary responsibility to . . . prevent racial discrimination from seeping into the jury section process." <u>Ibid.</u>

33

IV.

The practice of running background checks on prospective jurors raises a question of first impression for the Court.

A.

All parties have an interest in seating "as impartial a jury as possible." State v. McCombs, 81 N.J. 373, 375 (1979). Collectively, the court and counsel must strive to ensure the selection of jurors who are unbiased and will search for the truth.

The process of voir dire -- of questioning prospective jurors -- is intended to identify and exclude people who cannot be impartial. To that end, trial judges pose a mix of pointed and open-ended questions to elicit relevant information from prospective jurors. Administrative Directive #4-07: Jury Selection -- Model Voir Dire Questions -- Revised Procedures and Questions (May 16, 2007).

The process must also be respectful of jurors who do not expect that by appearing for jury duty, they will be subject to a criminal history check. See State v. Bessenecker, 404 N.W.2d 134, 138 (Iowa 1987). If that were the case, many qualified jurors would be less willing to serve, and some might not appear altogether.

Today, the State alone has the ability to unilaterally conduct criminal history checks on prospective jurors. Although defendants may search for public information that is available online, they cannot access official databases with the most accurate data. Under the current system, therefore, both sides do not operate under the same set of rules.

The State represents that it is extremely rare for it to conduct background checks on prospective jurors. It relies on regulations promulgated by the Department of Law and Public Safety as the source of its authority. The regulations restrict "[a]ccess to criminal history record information for criminal justice purposes . . . to criminal justice agencies." N.J.A.C. 13:59-2.4(a) (emphasis added). Criminal justice agencies may obtain that information "for purposes of the administration of criminal justice." Id. at -2.1(a) (emphasis added). The highlighted terms encompass "[t]he detection, apprehension, detention, . . . prosecution, [or] adjudication . . . of accused persons or criminal offenders." Id. at -1.1. Because jury selection is a part of the adjudicative process, the State contends, it has the power to run criminal history checks on prospective jurors.

There is very little case law on the subject. We therefore do not question the State's good-faith belief that it had the authority to run the background check it conducted in this case. But administrative regulations generally may

not govern the intricacies of jury selection any more than they could control other aspects of a trial.

The State Constitution authorizes the Legislature to pass general, but not special, laws relating to "[s]electing, drawing, summoning or empaneling grand or petit jurors." N.J. Const. art. IV, § 7, ¶ 9(4).[4] At the same time, the Constitution directs that "[t]he Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts." N.J. Const. art. VI, § 2, ¶ 3; see also Winberry v. Salisbury, 5 N.J. 240, 243-48, 255 (1950) (noting that the area of practice and procedure is exclusively within the Court's rulemaking power); In re Supervision of Petit Jury Panels, 60 N.J. at 559-62 (discussing various statutes but noting that "the Constitution reposes in the Supreme Court the responsibility to see that all aspects of jury procedure -- so uniquely vital to our system of judicial administration -- are preserved, maintained and developed to play their essential part in meting out justice").

The above regulations are therefore not determinative of how and when background checks can be done of prospective jurors.

---

[4] N.J.S.A. 53:1-20.6(a), which enables the Superintendent of the State Police to adopt rules and regulations relating to the "dissemination . . . of criminal history record background information" is not a source of authority for the process of selecting jurors.

36

B.

New Jersey case law on the issue is sparse. One reported Law Division decision rejected the State's request for a list of dates of birth for members of the jury pool. In re State ex rel. Essex Cnty. Prosecutor's Off., 427 N.J. Super. 1, 26 (Law Div. 2012). The State intended to use the information to run criminal background checks on prospective jurors. Id. at 4.

The court noted that individuals summoned for jury service have reasonable privacy concerns, id. at 19, and that providing information only to the prosecution raised due process issues, id. at 24-25. The court also observed that granting the State full "discretion to decide which jurors to research and for what reasons" raised concerns addressed in Batson and Gilmore. Id. at 25. In the end, the court held that "[t]he neutrality of the Judiciary, fundamental notions of fairness, due process protections afforded to criminal defendants, and the potential for abuse in the uneven sharing of information" counseled against giving "private juror information to the State." Id. at 25-26.

Other jurisdictions have considered background checks on prospective jurors. The Iowa Supreme Court held that prosecutors may run a criminal history check only if they first obtain a court order. Bessenecker, 404 N.W.2d at 138 (interpreting a state statute). To justify the request, prosecutors must

show "there is a reasonable basis for believing that the rap sheet may contain information that is pertinent to the individual's selection as a juror and that is unlikely to be disclosed through voir dire or through juror questionnaires." Ibid.

To avoid possible abuses, the Supreme Judicial Court of Massachusetts has held that prosecutors must obtain court approval to perform criminal record checks on jurors after a jury is sworn. Commonwealth v. Hampton, 928 N.E.2d 917, 930-31 (Mass. 2010). If a check is run during jury selection, prosecutors must immediately share the information with defense counsel. Commonwealth v. Cousins, 873 N.E.2d 742, 750 (Mass. 2007).

Other jurisdictions also require prosecutors who access criminal history records to disclose that information to defense counsel. See State v. Goodale, 740 A.2d 1026, 1030-31 (N.H. 1999); Losavio v. Mayber, 496 P.2d 1032, 1034-35 (Colo. 1972) (en banc); Tagala v. State, 812 P.2d 604, 612-13 (Alaska Ct. App. 1991); see also State v. Second Jud. Dist. Ct., 431 P.3d 47, 50-52 (Nev. 2018) (requiring disclosure of criminal history information from a government database that is unavailable to the defense upon a defense motion); Bessenecker, 404 N.W.2d at 139 (requiring disclosure to defendant "unless good cause is shown to the contrary"); cf. People v. Murtishaw, 631 P.2d 446,

465 (Cal. 1981) (holding trial judges "have discretionary authority to permit defense access to jury records and reports").

Yet other courts impose no such limits on the prosecution. See Coleman v. State, 804 S.E.2d 24, 30 (Ga. 2017); Charbonneau v. State, 904 A.2d 295, 319 (Del. 2006); State v. Smith, 532 S.E.2d 773, 779-80 (N.C. 2000); People v. Franklin, 552 N.E.2d 743, 750-51 (Ill. 1990); State v. Jackson, 450 So. 2d 621, 628 (La. 1984); Salmon v. Commonwealth, 529 S.E.2d 815, 819 (Va. Ct. App. 2000); State v. Hernandez, 393 N.W.2d 28, 29-30 (Minn. Ct. App. 1986).

C.

In providing guidance on this topic, we attempt to accommodate multiple interests: the overriding importance of selecting fair juries that are comprised of qualified, impartial individuals; the need for an evenhanded approach that applies to all parties; the need to guard against background checks prompted by actual or implicit bias; and the importance of having a process that respects the privacy of jurors and does not discourage them from serving. With those aims in mind, we rely on the Court's supervisory power to outline the following framework for conducting criminal background checks of jurors. See N.J. Const. art. VI, § 2, ¶ 3; In re Supervision of Petit Jury Panels, 60 N.J. at 561-62.

Going forward from today, any party seeking to run a criminal history check on a prospective juror must first get permission from the trial court. For requests made before the jury has been empaneled, the prosecution or defense should present a reasonable, individualized, good-faith basis to believe that a record check might reveal pertinent information unlikely to be uncovered through the ordinary voir dire process. See Bessenecker, 404 N.W.2d at 138. The Attorney General agrees that mere hunches are not sufficient to justify a criminal record check.

Opposing counsel must be notified of the request. If counsel objects, the court should give both sides an opportunity to be heard. As a general rule, we do not envision a full-blown Batson/Gilmore hearing at this phase of the proceedings. Trial judges have discretion to limit or expand the scope of an argument based on the circumstances presented and the interests set forth above.

Certain requests can be dispensed with quickly. The Attorney General appropriately conceded that prosecutors should not seek to check "jurors' criminal histories just because they deny having been arrested, charged with a crime, or convicted of a crime." Nor would there be a reasonable basis to conduct a background check simply because a prospective juror had prior contact with law enforcement officers; expressed distrust of law enforcement;

40

has a close relationship with individuals who have been accused of or were victims of crime; lives in a high-crime neighborhood; has a child outside of marriage; receives public benefits; or is not a native English speaker. <u>See</u> <u>Wash. Gen. R.</u> 37(h). We adopt those presumptively invalid reasons in large part from a rule the Washington Supreme Court enacted in the context of peremptory challenges. <u>See</u> <u>ibid.</u>

As a practical matter, the Judiciary does not have the ability to conduct background checks on its own. If the court grants a party's request, the prosecution will ask the appropriate law enforcement official to run a criminal history check. To ensure a level playing field, the results are to be shared with all parties and the court.

If the results raise legitimate concerns about a person's ability to serve, the trial judge should question the prospective juror. <u>See</u> <u>Andujar</u>, 462 N.J. Super. at 555. Some individuals may simply not qualify for jury service under the law.[5] In other cases, the outcome may be far from clear. Jurors, therefore,

---

[5] N.J.S.A. 2B:20-1 lists the statutory requirements for jury service. To be eligible, a person must (1) be 18 years of age or older, (2) be able to read and understand English, (3) be a citizen of the United States, (4) be a resident of the county in which the individual was summoned, (5) not have been convicted of any indictable offense, and (6) not have any mental or physical disability that would prevent the person from serving. A prior arrest or outstanding warrant does not automatically bar an individual from serving on a jury.

41

should generally be afforded an opportunity to explain and provide context for the results of a background check.

Judges are to question prospective jurors on the record and may invite counsel to supplement the inquiry, consistent with Rule 1:8-3(a). Afterward, either party can seek to remove the juror for cause or use a peremptory challenge. At that point, a party may raise a Batson/Gilmore challenge.

In very rare cases, a party may ask the court for leave to perform a criminal record check on a juror after a jury is empaneled. To avoid any possible efforts to manipulate the make-up of a sitting jury, requests for background checks of empaneled jurors should be granted only when compelling circumstances exist. See Hampton, 928 N.E.2d at 930-31. If, for example, a party learned during trial that a sitting juror had been convicted of an indictable offense, the situation would present a compelling circumstance.

V.

Under the circumstances here, we find that defendant was denied his right under the State Constitution to a fair and impartial jury selected free from discrimination. The record reveals that implicit or unconscious racial bias infected the jury selection process in violation of defendant's fundamental rights.

Earlier in the opinion, we recounted the voir dire process for F.G. at length and set out different concerns the State and defense counsel voiced. Among other reasons, it appears from the record that the State did not want F.G. seated as a juror because of his relationships with multiple individuals who had committed crimes or were victims of crime. F.G., a Black male from Newark, admitted he grew up in a neighborhood where many residents sold drugs, including a number of his friends. He said he knew them and was familiar with their lifestyle but explained he did not follow their path. He also explained that he was familiar with certain language used in the criminal justice system, like "CDS" and "trigger lock," from the "neighborhood."

None of that disqualified F.G. from serving on a jury. Growing up in high-crime area is not a basis to be removed from a jury panel. Having friends who broke the law is not either. Just the same, understanding actual terms that relate to drug and firearms offenses is not a reason to be kept off a jury.

F.G., an employee at the Department of Public Works who coached football in his spare time, made clear that he believed the criminal justice system was fair and effective "because you are judged by your peers." Yet the prosecution suggested his background and associations "dr[ew] into question whether he respect[ed] the criminal justice system" and the rule of law. Taken

43

as a whole, the State's arguments during the voir dire process to remove F.G. reflected implicit or unconscious bias about race.

As the Appellate Division aptly noted, "[t]he prosecutor presented no characteristic personal to F.G. that caused concern, but instead argued essentially that because he grew up and lived in a neighborhood where he was exposed to criminal behavior, he must have done something wrong himself or must lack respect for the criminal justice system." Andujar, 462 N.J. Super. at 562. That argument, the court observed, was not new, and historically stemmed from impermissible stereotypes about racial groups -- particularly Black Americans. Ibid.

The prosecution also speculated that, based on F.G.'s answers, it "felt" as though he knew more people who had been accused or were victims of crimes and had not been forthcoming about them. Defense counsel, in response, pointed out the obvious: that living in a high-crime area exposes a person to certain facts of life. Counsel noted that "to hold it against him that . . . things have happened around him to people that he knows . . . would mean that a lot of people from Newark would not be able to serve."

The trial court properly denied the State's challenge that F.G. be removed for cause. Ordinarily, the next step would have been for the State to exercise a peremptory challenge that defendant could have challenged under

44

Batson and Gilmore. Instead, the State ran a criminal history check on F.G. In doing so, it relied on reasons the trial court had rejected. To be clear, the State would not have been able to run a criminal history check under the standard outlined above. It has yet to offer a reasonable, individualized basis for conducting a record check of F.G. As a result, to the extent the State relies on the results of the check to justify F.G.'s removal, its argument lacks force.

The series of events raises another serious concern as well. According to the record, the State did not randomly search prospective jurors for their criminal history. It focused on a single juror, F.G. As the Supreme Court has explained, disparate investigations of minority jurors may turn up "seemingly race-neutral reasons to strike the prospective jurors of a particular race." Flowers, 588 U.S. at ___, 139 S. Ct. at 2248. Disparate investigations may also indicate that discrimination has occurred during jury selection. See ibid.

F.G.'s record check uncovered two prior arrests and an outstanding warrant from Newark Municipal Court issued in 2015. F.G. had no prior convictions, and the open warrant for simple assault was dismissed eight weeks later. His history did not disqualify him from jury service. See N.J.S.A. 2B:20-1.

The State appropriately alerted the judge and defense counsel to the results. But it also contacted law enforcement in an apparent effort to have

45

F.G. arrested before jury selection resumed.  With F.G.'s arrest set in motion, the discussion in court the day after F.G.'s voir dire shifted to how his arrest should be carried out.

Defense counsel did not object to the State's renewed application to remove F.G. for cause.  Counsel, however, did place a number of concerns on the record:  that the State singled out F.G. to check for a criminal record; that it chose to run a background check on a juror it did not like; and that selectively targeting F.G. implicated constitutional concerns.  When the prosecution renewed its motion to remove F.G. for cause, counsel should have presented a more crisp, precise objection, which the defense has since advanced.  At the time, despite the broader concerns counsel asserted, defense counsel asked only for an additional peremptory challenge.

Under settled case law, counsel must present a timely objection during jury selection.  See Gilmore, 103 N.J. at 535 (concerning objections to peremptory challenges); Osorio, 199 N.J. at 501.  We do not relax that requirement.  An objection prompts the timely review of any questionable challenges under Batson/Gilmore.  Here, however, by unilaterally running a criminal history check on F.G. and setting his arrest in motion, the State effectively evaded any Batson/Gilmore analysis.  In light of the framework outlined for future background checks, what took place at defendant's trial is

46

unlikely to happen again. Nonetheless, we cannot look away from evidence suggesting implicit bias in the jury selection process that appears in the extensive record before the Court.

Although no formal Batson/Gilmore evaluation was conducted before the trial court, the record relating to F.G.'s removal is unusually detailed. An extended series of arguments over the course of two days sets forth the parties' positions and explains their actions. That record reveals that the circumstances surrounding F.G.'s dismissal allowed for an inference that his removal was based on race -- which, again, is a slight burden to establish. See Batson, 476 U.S. at 97 (noting that a party's "questions and statements during voir dire examination and in exercising [the party's] challenges may support or refute an inference of discriminatory purpose"); Osorio, 199 N.J. at 492.

F.G., a minority juror, answered all questions posed in a manner that led the trial judge to conclude "he would make a fair and impartial juror." The judge added, "[e]verything he said and the way he said it leaves no doubt in my mind that he[] . . . does not have any bias towards the State nor the defense for anything." The State nonetheless selectively conducted a background check on F.G. alone, based on a hunch F.G. could not be impartial because of his background, associations, and familiarity with the criminal justice system. See Flowers, 588 U.S. at ___, 139 S. Ct. at 2247-48; Gilmore, 103 N.J. at 539.

47

For reasons already discussed, the State's justifications for running the check and seeking F.G.'s removal did not rebut that inference of discrimination. Osorio, 199 N.J. at 492, 504. In fact, the trial court had already considered and discounted the State's reasons when the court denied its motion to remove F.G. for cause. And throughout the appellate process, the State has not provided a convincing non-discriminatory reason for the steps it took to keep F.G. off the jury.

Finally, weighing the evidence in the record as a whole reveals, by a preponderance of the evidence, that F.G.'s removal and the background check that prompted it stemmed from impermissible presumed group bias. Id. at 492-93. Plus, as noted earlier, the background check itself did not uncover information that disqualified F.G. from serving on a jury.

To be clear, we do not find the trial prosecutors engaged in purposeful discrimination or any willful misconduct. The record, instead, suggests implicit or unconscious bias on the part of the State. In the end, we find that defendant's constitutional right to be tried by an impartial jury, selected free from discrimination, was violated.

There are a limited number of remedies available now. During jury selection, a trial court can return an excused juror to the jury box, forfeit one side's peremptory challenges, grant the other side additional ones, or start the

48

selection process anew.  See Andrews, 216 N.J. at 293.  None of those options exist at this time.  We agree with the Appellate Division that defendant's conviction must be reversed and the case remanded for a new trial.  Andujar, 462 N.J. Super. at 563.

No showing of prejudice is required.  Wagner, 180 N.J. Super. at 567.  The violation of defendant's constitutional right in this case is not subject to a harmless error analysis.  Gilmore, 103 N.J. at 544.

VI.

For reasons noted earlier, we have considered implicit bias as part of the Gilmore analysis in this appeal.  Defendant is entitled to the benefit of this new rule of law.  Except for him, we apply the rule only to future cases -- that is, cases in which a jury has not yet been selected -- because of the effect that retroactive application would have on a potentially large number of cases with incomplete records and the effect on the administration of justice overall.  See State v. Henderson, 208 N.J. 208, 300-02 (2011).  The Court plans to provide additional guidance on how trial courts should assess implicit bias after the Judicial Conference discussed in the following section.  The new rule will go into effect when that guidance is available.  See id. at 302 (implementing a new rule thirty days after "this Court approves new model jury charges on eyewitness identification").

## VII.

A defendant's right to a properly selected jury is precious and must not be tainted by discrimination. Osorio, 199 N.J. at 492. In the same way, no citizen should be denied the right to serve because of the person's religious principles, race, ethnicity, national origin, gender, sexual orientation, or some other impermissible basis. See Powers, 499 U.S. at 409 (noting jurors have "the right not to be excluded . . . on account of race"); Gilmore, 103 N.J. at 526 n.3 (identifying, at a minimum, certain cognizable groups). The harm in both instances extends beyond the defendant and the excluded juror. It "touch[es] the entire community" and "undermine[s] public confidence in the fairness of our system of justice." Batson, 476 U.S. at 87.

The criminal justice system rests on having cases decided by impartial jurors, who are drawn from a representative cross-section of the community and selected free from discrimination. To give meaning to those principles, we must acknowledge that discrimination can infect the existing jury selection process. And we must take steps to address that serious problem.

As discussed above, qualified jurors can be excused in two ways. The court may excuse them for cause if it appears they cannot serve as fair and impartial judges of the facts. And attorneys, in their discretion, can use peremptory challenges to strike individual jurors without stating a reason.

50

Federal and state courts both allow for peremptory challenges. In non-capital felony cases, federal courts grant ten challenges to defendants and six to the government. Fed. R. Crim. P. 24(b)(2). In state courts, the national average for peremptory challenges in non-capital felony trials is approximately seven. Nat'l Ctr. for State Cts., Comparative Data: Peremptory Challenges, https://www.ncsc-jurystudies.org/state-of-the-states/jury-data-viz (last visited July 7, 2021).

The number of peremptory challenges in New Jersey stems from a statute enacted more than a century ago. See L. 1898, c. 237, §§ 80-83; see also Brown v. State, 62 N.J.L. 666, 672 (E. & A. 1899). The nineteenth-century law granted defendants twenty challenges and the State twelve for various serious crimes. Ibid. New Jersey still allows the same number of challenges for serious offenses. See N.J.S.A. 2B:23-13(b).[6]

Our state today provides far more challenges than any other in the nation -- more than twice the national average, and twice the practice in federal court. But as the Supreme Court has recognized, "there can be no dispute[] that

---

[6] The 1898 law listed these offenses: treason, murder, misprision of treason, manslaughter, sodomy, rape, arson, burglary, robbery, forgery, perjury, and subornation of perjury. L. 1898, c. 237, § 80. N.J.S.A. 2B:23-13(b) covers a similar, broader list of offenses: kidnapping, murder, aggravated manslaughter, manslaughter, aggravated assault, aggravated sexual assault, sexual assault, aggravated criminal sexual contact, aggravated arson, arson, burglary, robbery, forgery (in the third degree), and perjury.

peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953)). As the Court further explained, "[t]he reality of practice, amply reflected in many state- and federal-court opinions, shows that [peremptory] challenge[s] may be, and unfortunately at times [have] been used to discriminate against black jurors." Id. at 98.

Although the law in New Jersey has not changed since 1898, society now has a greater appreciation for the role of implicit or unconscious bias in general, and the danger of discrimination in the jury selection process. Some sources observe that discriminatory challenges persist after Batson and that "peremptory challenges have become a cloak for race discrimination." Saintcalle, 309 P.3d at 334. Others maintain that peremptory challenges offer "very real protections against juror bias." N.J. State Bar Ass'n, Pandemic Task Force Report of the Committee on the Resumption of Jury Trials 3 (July 2, 2020) https://tcms.njsba.com/personifyebusiness/Portals/0/ 2020%20Pandemic%20Task%20Force/NJSBA%20RJT_Jury%20Selection%2 0Proposal.pdf.

It is time for a thoughtful, comprehensive discussion of the issue. In the past, the Judiciary has arranged Judicial Conferences to consider significant

issues and make improvements in the justice system. Topics have included speedy trial, Probation, Family Court, alternative dispute resolution, and juvenile justice, among others.

Today, we ask the Director of the Administrative Office of the Courts to arrange for a Judicial Conference on Jury Selection to convene this fall. Rule 1:35-1 outlines the Conference's membership. In addition to the officials, organizations, and public members the Rule identifies, the Court will invite legal experts, scholars, and interested advocacy groups to participate, including organizations that regularly appear before the Court as amici curiae.

The Conference will explore the nature of discrimination in the jury selection process. It will examine authoritative sources and current practices in New Jersey and other states, and make recommendations for proposed rule changes and other improvements.[7] The purpose of the Conference is straightforward: to enhance "public respect for our criminal justice system and the rule of law" by "ensur[ing] that no citizen is disqualified from jury service because of . . . race" or other impermissible considerations. Batson, 476 U.S. at 99.

---

[7] At this time, we decline to adopt rule changes that defendant and amici recommend. Their suggestions as well as others may be raised at the Judicial Conference where all interested parties will have an opportunity to weigh in.

We invite the legal community as a whole to take part in a probing conversation about additional steps needed to root out discrimination in the selection of juries.

## VIII.

For the reasons set forth above, we modify and affirm the judgment of the Appellate Division and remand the case for a new trial. We also call for a Judicial Conference on Jury Selection.


JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.